## TEXAS INDEMNITY INS. CO. v. DUNLAP et al.

### No. 2450.

Court of Civil Appeals of Texas. Beaumont.
Feb. 14, 1934.

Rehearing Denied Feb. 21, 1934.

Lipscomb & Lipscomb, of Beaumont, for appellant.

Samuel Belden and E. C. Gaines, both of Austin, for appellees.

COMBS, Justice.

This is a compensation case; Magnolia Petroleum Company was the employer; appellant, Texas Indemnity Insurance Company the compensation insurance carrier; Howard Dunlap, deceased, referred to in the testimony as "H. H. Bass," the employee, and his father and mother the compensation claimants. The case was tried in the district court of Jefferson county as an appeal by appellant from an adverse award of the Industrial Accident Board. The verdict of the jury was that: (a) Dunlap died on or about the 15th day of March, 1930,. "as the result of the injuries received in the course of his employment"; (b) good cause was shown "for failure of claimants to file their claim prior to March 21, 1931"; (c) hardship would result to claimants if the compensation is not paid in a lump sum; (d) prior to his death the deceased did not "willingly and actively participate in horseplay or frolic with C. K. Gibbs"; (e) immediately prior to his death deceased was not "engaged in an unlawful attempt to injure his coemployee Gibbs"; (f) the death of the deceased was not caused by the act of a third person intended to injure him, "because of reasons personal to him and not directed against him as an employee or because of his employment." Judgment was entered in favor of the claimants, in accordance with the verdict of the jury.

Appellant insists that appellees' petition and cross-action was subject to the general demurrer, and that under all the evidence it was entitled to an instructed verdict. The point made is that under the pleadings and the undisputed evidence the deceased, Howard Dunlap, at the time of his death, was aggressively engaged in a personal encounter with C. K. Gibbs, a fellow employee; that he resented a practical joke perpetrated upon him by Gibbs, and in doing so he voluntarily turned aside from his employment and willingly engaged in a fight with Gibbs, which resulted in his death; that the evidence was insufficient to raise the issue that he died "in the course of his employment." As appellees' petition in cross-action was sufficient to support the introduction of all the evidence offered by them and appellant's answer supported the proposition now advanced on this appeal, it is not necessary to discuss the pleadings of either party, but the merits of the appeal can be determined by a review of the testimony. The only evidence in the record on the issue raised by appellant's propositions consists of the following written statements.

by James A. Redmond, C. H. Shawver, J. S. Yancey, and C. K. Gibbs, the four eyewitnesses to the unfortunate tragedy. These statements were taken for submission to the Industrial Accident Board. James A. Redmond testified as follows:

"The trouble between H. H. Bass and C. K. Gibbs started on Friday, March 14, in the work room south of No. 1 Pump House, when Gibbs painted the handle of Bass' tool box with red lead, while Bass was on the outside. When Bass came back in, he accused Gibbs of painting the handle on his tool box and Gibbs told him that while he had not done it he would clean it off and he did.

"The next morning, about 10 A. M., March 15, C. H. Shawver, J. S. Yancey, H. H. Bass, C. K. Gibbs and I (James A. Redmond) were in the work room again which is just south of No. 1 Pump House doing shop work because it was raining too hard to work on live wire on the outside.

"Bass told Gibbs that he had better not paint his tool box handle again because if he did, he was going to get on him, both of them laughing and joking about it, and Gibbs laughed and said he was going to see what Bass was going to do about it, and he got a stick, put some red lead on it and started as if to put it on the handle.

"Bass ran Gibbs to the back end of the store room and hit him on the nose, making it bleed. Gibbs got some water and washed his face and went and sat down, and told Bass he thought that was a dirty trick. Bass went back to where Gibbs was sitting down and told him if he did not like that, he would do more than that. Then Gibbs got up and they began tussling, and wrestled back to the center of the room. Gibbs fell to the floor, Bass on top of him. Gibbs shoved Bass off and got up, and Bass got up and shoved Gibbs into the brick wall, then Gibbs said 'let's quit' and turned to get away from Bass, and Bass just slumped down to the floor.

"I ran after Dr. English, while Yancey gave Bass artificial respiration until Shawver relieved him to let him go after Mr. Chadbourne.

"We worked on him for quite a while after Dr. English came but could not revive him.

"Dr. English finally pronounced him dead."

C. H. Shawver testified as follows:

"About 10 A. M. on the morning of March 15, Saturday, J. S. Yancey, J. A. Redmond, H. H. Bass, C. K. Gibbs and I (C. H. Shawver) were working in the work room just south of No. 1 Pump House, because it was raining too hard to work on live wires on the outside.

"I heard Bass tell Gibbs that he had better not paint the handle on his tool box again because if he did, he was going to get on him. Both of them were laughing and joking about it and Gibbs laughed and said he was going to see what Bass would do about it, and got a stick, put some red lead on it and started as if to put it on the tool box handle.

"Bass ran Gibbs to the back end of the store room and hit him on the nose, making it bleed. Gibbs got some water, washed his face and sat down. He told Bass he thought that was a dirty trick. Bass went back to where Gibbs was sitting and told him if he did not like that, he would do more than that, then Gibbs got up and they began tussling, and wrestled back to the center of the room. Gibbs fell to the floor, Bass on top. Gibbs shoved Bass off and got up, and Bass got up and shoved Gibbs into the brick wall, then Gibbs said 'let's quit' and turned to get away from Bass, and Bass just slumped down to the floor.

"Redmond ran after Dr. English, and Yancey gave Bass artificial respiration for a while, then I gave him artificial respiration while Yancey ran after Mr. Chadbourne.

"We worked on him for quite a while after Dr. English came but could not revive him.

"Dr. English finally pronounced him dead."

J. S. Yancey testified as follows:

"The trouble between H. H. Bass and C. K. Gibbs started on Friday March 14, in the work room south of No. 1 Pump House, when Gibbs painted the handle of Bass' tool box with red lead, while Bass was on the outside. Bass came back and accused Gibbs of painting the handle on his tool box and Gibbs told him that while he had not done it, he would clean it off and did so.

"The next morning, about 10 A. M., March 15, C. H. Shawver, J. A. Redmond, H. H. Bass, C. K. Gibbs and I (J. S. Yancey) were in the work room again, which is just south of No. 1 Pump House doing shop work because it was raining too hard to work on live wires on the outside.

"Bass told Gibbs that he had better not paint his tool box handle again because if he did, he was going to get on him. Both of them were joking and laughing about it, and Gibbs laughed and said he was going to see what Bass was going to do about it, and he got a stick, put some red lead on it and started as if to put it on the handle.

"Bass ran Gibbs to the back end of the work room and hit him on the nose, making it bleed.

Gibbs got some water and washed his face and went over and sat down, and told Bass he thought that a dirty trick. Bass went back to where Gibbs was sitting down and told him if he did not like that he would do more than that, then Gibbs got up and they began tussling, and wrestled back to the center of the room. Gibbs fell to the floor, Bass on top. Gibbs shoved him off and got up and Bass got up and shoved Gibbs into the brick wall, then Gibbs said 'let's quit' and turned to get away from Bass and Bass just slumped down to the floor.

"Redmond ran after Dr. English, while I gave Bass artificial respiration.. I asked Shawver to take my place while I went after Mr. Chadbourne, then foreman. We worked on him for quite a while after Dr. English came but could not revive him. Dr. English finally pronounced him dead."

C. K. Gibbs testified as follows:

"My name is C. K. Gibbs. I live on Route 1, Montgomery, Tex., and on March 14th, 1930, I worked for the Magnolia Petroleum Co., at Beaumont, Tex.

"While employed there I met H. H. Bass, whose name I learned later was Howard Dunlap.

"On or about March 14th, 1930, for a joke, I painted the handle of Bass's tool box with red lead. Bass came in and saw it and accused me of painting it and after a while I cleaned it off. It was all in a joke, for we were good friends, and I thought no more about it.

"Then the next day, we were just laughing and talking about the matter, he said if I did it again he would get on me. I says, 'I believe I will do it and see if you will do it.' I grabbed the paint brush, but didn't paint the box. Bass, in fun, ran me back to the end of the building and began hitting me, but all the time it was just in fun. One of his licks hit me on the nose and it commenced bleeding quite a bit. When Bass saw the blood he said he didn't mean to hit me on the nose. I sat down and started washing off the blood, Bass standing close by, leaning against the work bench.

"I told him that was a dirty trick and then Bass came back at me and we clinched. He threw me down and we struggled around a while and I got up. We clinched again and he backed me up against the wall. He held me there a moment, and I said, 'Let's quit, Bass,' and he didn't say anything. I moved to one side and when I looked towards him he was falling down. One or two men then came up and started giving him artificial res-

piration and while they were working on him I went and sat down. I had no idea that anything much was the matter and I was just resting from the exertion.

"Seth Hensley arrested me and on the way to town I stopped at the Medical Office, where Dr. English patched me up. I was taken to the County Jail and held in the 'bull pen' until I made bond. A day or so afterwards I was given an examining trial before Judge J. W. Redman and turned loose. Nothing else was done.

"I had known Bass a few months and he and I were fairly good friends. The squabble over the matter of painting his tool box was all in fun and I so considered it then and say so now. I did not expect Bass to take this but as a joke and when the tussel first started I had no idea that he was really mad about it, and I do not know now that he was, only a bit peeved.

"So far as I know I did nothing to cause his death or even to have caused him any inconvenience. Bass was the aggressor all the way through and I was simply trying to hold him off of me, and until he hit me in the nose I was laughing, and when he did that to me, I got sort of mad myself, but nothing I did to him would have caused his death if he had been in normal health."

The majority of the court construes the evidence as showing conclusively that at the time of his death Dunlap had voluntarily turned aside from his employment and was engaged in a scuffle with Gibbs which was in no way provoked or caused by his employment. This fact conclusion denies the rights of the claimants to compensation, and requires that the judgment of the lower court be reversed and judgment here rendered in favor of appellant. From this order Mr. Chief Justice WALKER dissents.

■ It is the law of this state that an employee is entitled to compensation for an injury received in horseplay where he does not willingly participate therein. But, where he voluntarily turns aside from his employment by inviting horseplay and then willingly engages therein, he cannot recover. Richardson v. Texas Employers' Ins. Co., 46 S.W.(2d) 439, decided by this court. In that case Richardson's death resulted because of a dispute about his lunch. The workmen, though not required by their master, generally carried their lunches with them to work. On the day before Richardson's death, Williams had appropriated his lunch, and the controversy grew out of that fact. This court held that the claim for Richardson's death was not

compensable. The facts of this case are on all fours with the facts of that case, in that the controversy between Dunlap and Gibbs resulted from the fact that Gibbs had painted the handle of Dunlap's tool box on the day before.

This case is controlled by the following proposition announced by Judge Leddy in United States Casualty Co. v. Hardie (Tex. Com. App.) 299 S. W. 871, 873. In that case Hardie was injured in a scuffle or encounter with a third person while he was on duty for his master. A clerk from the store next door came in where Hardie was working, saw that he had on a new suit of clothes, and was tusseling with him with the avowed purpose of injuring the clothes. Of the facts of the case Judge Leddy, speaking for the Commission of Appeals, said: "It must be borne in mind that the claimant did not by word or act invite the struggle which resulted in his injury. He was an unwilling participant therein. He protested against the same from the very beginning, and at no time said or did anything which even tended to indicate that the struggle was a mutual one."

Though Judge Leddy held Hardie's injury compensable, he recognized the following distinction between that case and the facts of this case: "If the claimant had voluntarily turned aside from his employment by inviting this struggle, or willingly engaged therein, then an altogether different question would be presented, as participating in such struggles was no part of his employment, and, if voluntarily done, would not be in furtherance of any duty he owed his employer or in any way in his interest."

Cherry v. Magnolia Petroleum Co. (Tex. Com. App.) 45 S.W.(2d) 555, 559, originated in this court, where liability was denied (24 S.W.(2d) 549). The Supreme Court granted a writ of error, and in affirming our judgment said: "We think further that, when one person unlawfully assaults another, he should expect the person assaulted to do the thing which the laws of nature and of the country give him the right to do, that is, to defend himself, and injuries so inflicted by the person wrongfully attacked on the attacker are not accidental injuries, but injuries invited and to be expected."

In the case before us Dunlap not only assaulted Gibbs first but voluntarily renewed the assault after Gibbs had walked away and sat down, thereby, we think, bringing the facts of this case clearly within the law of Cherry v. Magnolia Petroleum Company.

Recovery was denied in Harris v. Texas Employers' Ins. Ass'n (Tex. Civ. App.) 257 S. W. 998, 1002, because of the employee's "willful intention and attempt to unlawfully injure some other person."

New Amsterdam Casualty Co. v. Collins (Tex. Civ. App.) 289 S. W. 701, 702, is so nearly in point with the facts of this case that we think it should be given controlling effect. In that case Collins and Roberts were working on the same lease. Roberts had painted a boiler, and some one had smeared the paint before it was dry. He became enraged at his fellow employees over this occurrence, and, on the same evening at about 6:40, and at the time when the night shift was on duty and after he had quit his own work, he went into the dressing room on the employer's property and accused everyone present, including appellee, of smearing the paint. All of the men denied the accusation. Roberts walked over to Collins, and again inquired of him whether he was sure he had not smeared the boiler, and made the further charge that Collins was wearing his underclothing. Roberts thus became the aggressor, and a fist fight ensued, in which Roberts was beaten in the face. Roberts left the premises stating to Collins that he (Collins) would regret what he had done. Shortly afterwards, and on the same night, Roberts' son made inquiry about the difficulty, and returned again in company with his father, who had a pistol. Collins, upon the return of the two Roberts, was standing on the pump cleaning light bulbs. No remark was passed, but the younger Roberts jerked Collins from the pump, and a struggle followed between the younger men. The elder Roberts drew his gun, and, after striking Collins in the back of the head with it, shot him in the eye. The court held that the injury was not compensable because it came within the provision of the statute excluding injuries caused by an act of a third person intended to injure an employee because of reasons personal to him and not directed against him as an employee. The court referred to, and thus distinguished, McClure v. Georgia Casualty Co. (Tex. Com. App.) 251 S. W. 800: "There the employees directly engaged in the difficulty were the day and night foremen, respectively; they got into a dispute about the night foreman not coming to work in time, and this brought on the fight in which a third person—* * * a brother of one of the others—intervened and inflicted the injury; the record fails to disclose whether or not this brother was himself an employee, but inferentially he was; the original participants were fellow employees, the altercation occurred on the plant

over the method or manner of doing the work, and at a time when these two, at least, * * * were engaged in the actual service of their common employer."

Indemnity Ins. Co. of North America v. Scott (Tex. Com. App.) 298 S. W. 414, 417, was a packing house case. An employee had thrown foul matter in the face of a fellow employee who was attacking him. As we understand the holding of the Supreme Court, recovery was allowed solely on the ground that the deceased employee was not attempting to injure the other party. The Commission of Appeals had held that, though there was an assault, it was justified by the attending circumstances. On that issue the Supreme Court said: "We think the judgment cannot be sustained upon the theory of passion or an inflamed mind on the part of Scott. Adequate cause does not make an assault lawful, but, at most, is only a mitigation."

Under that proposition Dunlap's assault on Gibbs was not justified.

This court allowed compensation in Consolidated Underwriters v. Saxon, 250 S. W. 447, 450, where Saxon was killed by a fellow employee in a controversy about the right of possession of two shovels belonging to the common master. Recovery was allowed in recognition of the proposition that, though the assault was made on deceased at the place where he was working, deceased was not "the aggressor."

The testimony of the witnesses, which we have set out in full above, shows conclusively, we think, that Dunlap was the aggressor. The incident of the painting of the tool box handle had occurred the day before. Gibbs had removed the paint from the handle and apparently intended to treat the matter as a closed incident. It was Dunlap, and not Gibbs, who renewed the matter on the occasion in question by bringing up the subject and telling Gibbs that, if he painted the handle again, he was going to get on him. Gibbs then made as if to paint it, and Dunlap chased him to the back of the room and struck him, making his nose bleed. Gibbs desisted from the scuffle, sat down and washed his face. Upon Gibbs' remarking that it was a dirty trick, Dunlap went back to where he was sitting and told him, if he did not like that, he would do more, or words to that effect. Gibbs arose, and the tussle was renewed. Apparently Dunlap threw Gibbs to the floor. At any rate, he fell on top of him. Gibbs pushed him off and got up. Dunlap then shoved him back against the wall. Gibbs

then said "Let's quit," and turned away from Dunlap, and it was then that Dunlap slumped to the floor. The testimony of all the witnesses agree upon these essential facts. They show, we think, that Dunlap was the aggressor. But, if the testimony is susceptible to the construction that he was not the aggressor, he was beyond all question a willing participant in the horseplay or scuffle which resulted in his death. In either case, the appellees cannot recover.

On the authorities cited and reviewed, the judgment of the lower court must be reversed and judgment here rendered for appellant.

WALKER, Chief Justice (dissenting).

I cannot agree with the judgment of my brethren that the evidence, as a whole, compels the conclusion that Dunlap had voluntarily turned aside from the duties of his employment and was willingly engaged in a fight or horseplay at the time of his death. The principle of law upon which my brethren base their opinion is supported by an unbroken line of authorities, as shown by the citations made by them. My dissent is based upon the inferences to be drawn from the testimony. Where the disagreement between two fellow employees arises out of the employer's work in which they are engaged, and as a result of the disagreement one of the employees is injured, as I understand the authorities, the jury may draw the inference that the injury arose out of the employment. This proposition has support in Pekin Cooperage Co. v. Industrial Commission, 285 Ill. 31, 120 N. E. 530, 532, where it is said: "Where men are working together at the same work disagreements may be expected to arise about the work, the manner of doing it, as to the use of tools, interference with one another, and many other details which may be trifling or important. Infirmity of temper, or worse, may be expected, and occasionally blows and fighting. Where the disagreement arises out of the employer's work in which two men are engaged, and as a result of it one injures the other, it may be inferred that the injury arose out of the employment."

That case was cited with approval by the Commission of Appeals in the McClure Case, cited by my brethren.

In this case the controversy arose while Dunlap (Bass) was actually engaged in his employment. Thus the witness Redmond said: "The next morning about 10 A. M. March 15, C. H. Shawver, J. S. Yancey, H. H. Bass (H. H. Dunlap), C. K. Gibbs and I were in the work room again, which is just south

of No. 1 Pump House, doing shop work because it was raining too hard to work on live wire on the outside."

The controversy arose out of the fact that Gibbs had painted the handlebar of Dunlap's tool box the day before, and the immediate cause of the controversy was his physical attempt to repaint the handlebar a second time over Dunlap's protest. These facts bring this case within the proposition of this court in the Saxon Case cited by my brethren, where it is said: "The altercation arose about a matter that originated in and had to do with the business of their common master." And as also said in that case: "The employment was at least a contributing proximate cause—a hazard to which he (Saxon) would not have been equally exposed apart from the employment. His presence at the place of injury was solely for and in the interest of his master's business. The trouble originated in and arose out of and about the master's business, and not out of personal matters of either Saxon or Johnson (the aggressor)."

The facts of this case are clearly distinguishable from the facts of the Richardson Case and the Collins Case, cited by my brethren. In the Richardson Case the controversy was over the fact that Williams had taken Richardson's lunch the day before. On the morning of the controversy he had not taken the lunch, nor was he threatening to take it. Everything that was said and done related to what had been done on the day before, and therefore the trouble did not originate in the master's business, but was a matter purely personal between Richardson and Williams. The same distinction exists in the Collins Case. In that case Roberts had painted the master's boiler. Collins interfered with the job. After all that was past and the parties had resumed their duties, the controversy was renewed, as in the Richardson Case.

The principle of law I am contending for was embodied in the following question propounded by Judge Leddy, in speaking for the Commission of Appeals, in the Hardie Case cited by my brethren: "The question arises, Does an injury received by an employee engaged in the active performance of his duties on the premises of the employer forfeit his right to compensation if he receives such injury while attempting to prevent a third party from interfering with the performance of the duties he owes to his employer?"

Judge Leddy answered his question in the negative, and in support of his answer announced the following proposition which I think absolutely controls this case: " * * * It is inherent in and incidental to any employment for an employee to resist forcible efforts which tend to prevent the discharge of the duties he owes to his employer. The term 'arising out of the employment,' in the sense in which it is used, is not to be understood as being restricted and confined to the exact duties prescribed for the servant. Whatever may be incidental to the employment must necessarily belong to it. A risk incidental to an employment may fairly be said to be one which belongs to or is connected with what a workman has to do in fulfilling his contract of service. U. S. Fuel Co. v. Ind. Com., 310 Ill. 85, 141 N. E. 401; Boorde v. Ind. Com., 310 Ill. 62, 141 N. E. 399."

The tool box was incidental to Dunlap's employment, and therefore he had a right to protect it against the efforts of Gibbs to paint it against his will. Being incidental to Dunlap's employment, it belonged to his employment. The risk Dunlap incurred in trying to prevent Gibbs from painting the handle of his tool box, being incidental to his employment, can be said to be one which belonged to, and was connected with, what Dunlap had to do in discharging his duties to his master. Of course, it must be conceded that the attempt of Gibbs to paint the handle of the tool box was a trivial circumstance, but the law does not deny compensation because the controversy was provoked over a trivial matter. On this issue it was said in Pekin Cooperage Co. v. Industrial Commission, supra: "The origin of this difficulty was trifling—the taking of a few staves from the claimant's rack, to which he objected, saying, as he testified, that if Miller would stay in there he would be up with the claimant. The dispute was concerning the employer's work in which the men were both engaged, and there is evidence tending to show that the claimant was not responsible for the assault."

All that is required is that the disagreement arise out of the employer's work. Had Gibbs been attempting to destroy the box, the right to compensation would be conceded. The difference between an act to destroy and Gibbs' act to paint is merely one of degree, and cannot control the disposition of the case. This necessarily follows because, as said by Judge Leddy in the Hardie Case, the Workmen's Compensation Law arbitrarily restricts the rights of employees who come within its provisions, and it has therefore been "the policy of the courts of this state to give as broad and liberal construction of such act in

favor of the employee as the terms of the act will permit." In further support of the affirmative answer to his question Judge Leddy, in the Hardie Case, cited the following proposition from Pace v. Appanoose County, 184 Iowa, 498, 168 N. W. 916: "What the law intends is to protect the employee against the risk or hazard taken in order to perform the master's tasks."

In affirming the judgment of this court allowing compensation in the McClure Case, supra, Judge Gallagher, speaking for the Commission of Appeals, cited with approval from Pekin Cooperage Co. v. Industrial Commission, supra, the proposition quoted above.

Applying that proposition to the facts of the McClure Case, Judge Gallagher then said: "We do not think the fact that the blow which inflicted the injury sustained by him was struck by Ed Hodge, the brother of his fellow fireman, Jim Hodge, who first assaulted him, affords any ground upon which to differentiate this case from cases above cited or to deny plaintiff in error compensation for his injuries. The original assault having resulted from a dispute between plaintiff in error and Jim Hodge growing out of their respective duties under their common employment, the unlawful and violent blow struck by Ed Hodge which was induced thereby must be considered a part and parcel thereof. We think that the injury so sustained by plaintiff in error had to do with and originated in the duties of his employment, and, though it was caused by the act of Ed Hodge, who at the time had a personal intent and purpose to injure him, such act was, within the meaning of our statute, directed against him as an employee or because of his employment."

I do not think it can be said, as a matter of law, that Dunlap renewed the controversy or scuffle after Gibbs sat down. True, Gibbs testified to that fact, but Gibbs was an interested witness on this issue. The testimony of the other witnesses is subject to the construction that Gibbs himself renewed the controversy. But this presents an immaterial issue. The controlling point is that the controversy originated in Dunlap's employment.

Whether the matter be treated as a fight or as horseplay is immaterial, provided the controversy had its origin in the employer's business. In Cassell v. United States Fidelity & Guaranty Co., 115 Tex. 371, 283 S. W. 127, 128, 46 A. L. R. 1137, the Supreme Court said: "Considering every employee peculiarly exposed to such pranks from his coemployees as are inspired by nothing more than a wellnigh universal human craving for fun, and recognizing that such pranks, when careless though innocent, not infrequently occasion bodily harm, we are forced to consider these pranks as a hazard which the employee required to work with others must encounter in the performance of his duties, and hence such pranks constitute a risk reasonably inherent in or incident to the conduct of the employer's business."

As I understand the facts of this case and the law controlling the facts, the judgment of the lower court should be affirmed.