**TEXAS EMPLOYERS INS. ASS'N v. SPARROW et al.**

No. 3212.

Court of Civil Appeals of Texas. Beaumont.

Nov. 11, 1937.

Rehearing Denied Nov. 24, 1937.

Royston & Rayzor, of Houston, for appellant.

Pipkin & Pipkin and Elton Cruse, all of Beaumont, for appellees.

O'QUINN, Justice.

This case arose under the Texas Workmen's Compensation Law (Vernon's Ann. Civ.St. art. 8306 et seq.). Southern Stevedoring & Contracting Company was the employer, Allen Sparrow the employee,

and Texas Employers Insurance Association the compensation insurance carrier. On November 18, 1935, while on the docks at the city wharf in the city of Beaumont, Tex., to perform the services for which he was employed, Allen Sparrow was stabbed and killed by a fellow workman. Steve Sparrow and Celena Sparrow, the father and mother of Allen Sparrow, duly filed claim before the Industrial Accident Board for compensation on account of the fatal injury of their said son, alleging that they were the sole beneficiaries under the law entitled to receive such compensation. Timely notice of the injury, death, and claim was had by all parties. May 4, 1936, the board made its final award in favor of claimants. Appellant duly gave notice that it would not abide said award, and duly filed this suit in the district court of Jefferson county, Tex., to set aside said award.

Appellees answered, and by cross-action fully and sufficiently pleaded set up their right to the compensation sought. The gist of the facts pleaded as a basis for recovery is set out in paragraph 5 of their petition, which reads:

"That on or about November 18, 1935, while in the course of his employment with Southern Stevedoring & Contracting Company of Texas, in Beaumont, Jefferson County, Texas, the said Allen Sparrow sustained 'a personal injury in the course of his employment' with said Southern Stevedoring & Contracting Company of Texas as said term is defined by and under the compensation act of the State of Texas which personal injury resulted in the death of the said Allen Sparrow, said death, occurring on the same day.

"In this connection claimants show that on or about October 15, 1935, or a short time previous thereof, a strike and/or boycott had been declared by certain labor unions or organizations and by certain stevedoring unions or organizations which was effective in a number of ports along the Gulf coast including the port of Beaumont, Texas.

"That said striking unions or organizations established strike or picket lines around the wharf and dock property in the City of Beaumont and from about the time of the commencement of said strike until its termination which occurred about January 1, 1936, the Police Department of the City of Beaumont placed police at the entrance to the city wharf and such policy remained on duty throughout the period of said strike and in this connection claimants show that the policy on guard at the entrance to said wharf property only admitted those who had business upon said wharf or who were employed there as stevedores.

"That on or about October 18, 1935, under cover of darkness and in large closed moving vans some 200 members of a non-striking negro union or organization were carried into said wharf property and during the continuation of said strime from time to time other members of said non-striking organization or those who later became members of such non-striking organization, slipped through the picket lines in question and sought and obtained work as longshoremen during the existence of said strike.

"That during the existence of said strike by reason of the picket lines maintained by the striking unions or organizations it was necessary for the non-striking and working longshoremen to remain upon said city wharf property continuously and they were forced to and did remain upon said wharf property throughout the period of said strike and it was necessary by reason of said peculiar conditions that said working longshoremen be furnished with sleeping accommodations on said wharf property and that they be fed upon said wharf property and that the employers of said working longshoremen made arrangements for sleeping quarters and made arrangements for feeding said working longshoremen upon said wharf property and by reason of said peculiar conditions said working longshoremen could not leave said city wharf property but were forced to remain thereon 24 hours a day, day in and day out, and throughout the night, and even on Sundays and whether working or not said longshoremen were in close contact and associated with each other.

"That by reason of the peculiar conditions affecting said employment as herein set forth the said working longshoremen and particularly the said Allen Sparrow were subjected to a much greater hazard and risk than were the general public and the chances of Allen Sparrow being injured or killed by some person or even by some associate were greatly multiplied over the chances of the general public for on account of the peculiar conditions of said employment as herein set forth the said Allen Sparrow was forced to associate constantly with the other working long-

shoremen for 24 hours each day and for days and nights at a time which circumstances as aforesaid created a special hazard and risk and said circumstances of themselves made it more likely that some of said working longshoremen would become nervous, irritable, and quarrelsome and that their conduct would be such as to cause possible injury and death and claimants show that as herein set forth such did happen with respect to the said Allen Sparrow.

"Claimants show that during the day of Monday, November 18, 1935, Allen Sparrow was engaged in the loading of the 'Jean' and that about 6 o'clock in the evening the work of loading was temporarily suspended until 7 o'clock for the period of about an hour to enable the longshoremen to rest and to obtain their lunch or supper.

"That as aforesaid it was necessary on account of said strike and said peculiar conditions that the working longshoremen secure their meals on the wharf property and such was the care for this particular meal and after said meal was furnished the said Allen Sparrow and other working longshoremen had a short time for rest, recreation, and like purposes before they were required to return to the loading of the ship in question.

"That by reason of the peculiar conditions herein mentioned the employer in question knew that said working longshoremen were in the habit of using a telephone on said wharf property for the purpose of talking to their wives, or other members of their family or to their friends and claimants show that the necessity of allowing this telephoning was so well-known and so acquiesced in that when the frequent use of the original telephone by said working longshoremen almost monopolized said telephone facilities, a separate telephone was installed for the exclusive use of such working longshoremen which telephone was located on or close to Shed No. 5 on the city wharf property.

"That Washington Jackson was a negro who was working on the city wharf property at the time in question and after the men had eaten on the evening in question (November 18, 1936) the said Washington Jackson was using the telephone mentioned and continued to use such telephone for some fifteen minutes or more. That after Washington Jackson had been using said phone for some fifteen minutes, Allen Sparrow, who was standing near said phone and waiting to use same, asked one R. N. Adams, who was the secretary of the working longshoremen, if there was not a time limit on the use of the said phone. That R. N. Adams told Sparrow that there was a time limit of five minutes for any one conversation and that Allen Sparrow then remarked, in an ordinary tone of voice, that Washington Jackson had been using the phone for a much longer period than five minutes. That neither the words nor the conduct of Allen Sparrow or of anyone else were such as to interfere with the use of said phone by Washington Jackson, but shortly after the conversation mentioned between Allen Sparrow and R. N. Adams, the said Washington Jackson without having said anything to Allen Sparrow, who then had his back turned to him, walked over to where he was standing and stabbed the said Allen Sparrow in the side and in his heart with a knife so as to cause the death of the said Allen Sparrow which death resulted from said injury and occurred on the same day.

"Claimants show as herein set forth the said Allen Sparrow was subjected to the risk of being killed as he was because of a risk peculiar to his employment and that but for his said employment the said Allen Sparrow would not have been at the place where he was when he was killed and would not have been subjected to said risk and further that the general public and people not having business on said city wharf property were not subjected to the same risk.

"Claimants further show that during all of the time that the said Allen Sparrow was on said city wharf property and at the time he was injured he was under the supervision of his said employer and further that all of the facts and peculiar conditions herein alleged were well-known to said employer and/or to the insurer herein or in the exercise of ordinary diligence said facts and circumstances would have been known to said employer and claimants show that the said injury in question was sustained by the said Allen Sparrow in the course of his employment with the Southern Stevedoring & Contracting Company of Texas and that the death of the said Allen Sparrow resulting from said injury was a compensable death within the purview and construction of the Compensation Law of Texas."

At the conclusion of the evidence, appellant moved for an instructed verdict which was refused. The case was then tried to a jury upon special issues, upon their answers to which judgment was rendered for appellees awarding them compensation in the sum of $4,681.44 payable in a lump sum. Motion for a new trial was overruled, and we have the case on appeal.

At the outset we are confronted with a motion by appellee to dismiss this appeal for want of jurisdiction of this court to hear and determine the issues presented by the appellant for the reason that the record was not filed herein within the time prescribed by law. We refuse the motion because we find that the time for filing the record was duly extended by timely and sufficient application therefor.

The statement of facts adduced upon the trial is long, consisting of more than 250 typewritten pages. We shall not undertake to state the substance of same, but will say that the evidence supports the allegations of appellees in their cross-petition, set out above.

Appellant presents four assignments of error, all complaining that the court erred in refusing to instruct a verdict in its favor, because: (a) The undisputed evidence shows that the death of Allen Sparrow was not caused by an injury sustained in the course of his employment; (b) that the undisputed evidence showed that Allen Sparrow did not receive the injury leading to his death while acting in the course of his employment, for the reason that the risk of the injury received was no greater in consequence of the employment than a similar risk to which the public generally was subject; (c) that the undisputed evidence showed that at the time he received the injury resulting in his death Allen Sparrow was not an employee of the Southern Stevedoring & Contracting Company of Texas; and (d) "That the undisputed evidence showed that the injury leading to the death of Allen Sparrow was not one sustained in the course of his employment because it was caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment."

We shall discuss the first three of these assignments together. We think the evidence indisputably shows that Allen Sparrow was an adult young single man, that he was an employee of the Southern Stevedoring & Contracting Company of Texas, that at the time of his death he, with others similarly employed (among whom was one Washington Jackson), was engaged in loading a steamship called Jean docked at the city wharf of the city of Beaumont, Tex., at or opposite to shed. No. 5 on said wharf. That on said date, November 18, 1935, and prior thereto, a strike by certain labor unions and certain stevedoring organizations was in effect and existed at a number of ports along the Gulf coast, including the port at Beaumont, and said port was being picketed by said striking organizations. That to facilitate the loading and unloading of ships at said port, the police department of the city of Beaumont placed police at the entrances to the city wharf for the purpose of preventing any except those who had business at the wharf or those who were employed to work there as stevedores from entering upon the premises. That some 100 members, or more, of a nonstriking negro union of stevedores were employed and conveyed in closed vans or tranfers onto said wharf for the purpose of loading and unloading ships entering said port and docking at said wharf. That during the existence of said strike because of the picket lines constantly (day and night) maintained by the striking unions or organizations, for the safety of the working, nonstriking stevedores, and the peaceably carrying on of the work, it became and was necessary for the working stevedores, of whom Allen Sparrow was one, to stay and remain at and on the wharf, that is day and night, and arrangements were made by their employers for them to eat and sleep on the situs of their work, and thus the work was carried on. Because of these conditions and surroundings, the workingmen could not safely leave the premises where they worked and they were forced to and did remain there for the 24 hours of the day, in close constant contact with each other, and we think the evidence abundantly shows that the risk or hazard of friction between the workers, and the liability of injury arising out of the situation, was greater than that to which the general public ordinarily was subject. It is but common knowledge that, where a number of persons are separated from the general public, and are constantly confined to limited quarters, with no relaxation other than their individual contacts with each other, because of their differing sentiments,

ideas of comport, varying of disposition, self respect, and respect for the feelings and rights of others, it is to be expected that friction, quarrels, insults, encounters, and even fatal injuries likely will occur. This is the common risk individuals must undergo in such situations. The first three of appellant's assignments above indicated are overruled.

■ We overrule appellant's fourth assignment that the injury of deceased was not sustained in the course of his employment, but was caused by the act of a third person intended to injure deceased because of reasons personal to deceased and not directed against him as an employee, or because of his employment.

This issue was submitted to the jury and they found against appellant. We think the evidence supports the finding. There is no evidence that Allen Sparrow was quarrelsome or unpleasant in his acts or relation, nor that he provoked the difficulty with his attacker. There is much evidence that Washington Jackson, the fellow employee who stabbed and killed Allen Sparrow, was quarrelsome, bossy, tried to be tough, difficult to get along with. Dewey White, colored worker testified: "I had to have him moved off the job I was on to put him on the job. He was always wanting to fight. He had his knife with him all the time." Sam Green, another worker testified:

"Q. On this strike job, did you have occasion to be around Washington Jackson a great deal? A. I did.

"Q. Did you have occasion to observe Washington Jackson so you could see whether or not he was quarrelsome and fussy or just how he acted? A. He was quite bossy and tried to be kind of tough like. I don't know what you might call it, because he tackled me about a tub I bought for my own personal use.

"Q. By saying he was kind of tough like, what do you mean? That he was just kind of ready to pick a fight with anybody? A. Anybody."

For the convenience of the workers a phone was installed on the wharf at or near shed 5 for them to call and talk to their family, or friends, to obtain articles to be sent to them which they could not leave the wharf to get. There was a rule that no one was to talk for a longer period than five minutes at any one time. Wash-ington Jackson frequently talked over the phone. On the evening of the killing the crew of workers had just finished eating supper, about 7 p. m., and would have resumed work on the next shift about an hour later. Allen Sparrow wanted to talk to his home to get some clothes sent to him. He walked near to the door that led to the phone. Jackson was talking. Sparrow stood near waiting for Jackson to stop talking. Thinking that Jackson had very much exceeded the five-minute limit, Sparrow inquired of a fellow worker, Adams, if there was a five-minute limit on the use of the phone, and Adams replied there was, and Sparrow then remarked that Jackson had been using it for more than five minutes. Jackson heard this and when he quit talking he hung up the phone and without anyone saying anything he walked up to Sparrow and stabbed him, killing him, and ran out of the shed. This was testified to by several close eyewitnesses.

Isaac Owens, one of the workers, and who was within a few feet of the killing testified: "And he (Jackson) knowed that they had a limit over the telephone, because the head man told him about the limit over the telephone, and every time he get to the telephone he wants to hold it for 15 or 20 minutes, and we all was down there in a strike and could not get out and we would all like to have a few words to say to our people, and he would always want to keep the telephone over the limit." On cross-examination, he further testified:

"Q. Didn't you hear Washington say he was going to stop this boy from bothering him when he was talking to his girl? A. No, sir. I tell you what I heard him say. He didn't specify no one. He said boys likes to come around the phone when he talked and he was going to break it up. That is what he said."

And, "I said Washington Jackson said he was going to break the boys from coming around the phone when he was talking to his girl. He was kind of a funny talker and they all liked to hear him talk and they would crowd up."

At the time in question Jackson was talking to his girl, claimed her to be his wife, though she denied she was married to him, but admitted she had been living with him. Jackson was indicted for the killing of Sparrow and pleaded guilty and was given a ten-year sentence.

The death of Sparrow had causal connection with his employment and the conditions connected with and surrounding same, and so was compensable. Casualty Reciprocal Exchange v. Parker (Tex.Com. App.) 12 S.W.(2d) 536; Vivier v. Lumberman's Indemnity Exchange (Tex.Com. App.) 250 S.W. 417; Southern Surety Co. v. Shook (Tex.Civ.App.) 44 S.W.(2d) 425 (writ refused); Standard Accident Insurance Co. v. Stanaland (Tex.Civ. App.) 285 S.W. 878 (writ refused); Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S.W. 72, 28 A.L.R. 1402.

The judgment should be affirmed, and it is so ordered.

Affirmed.