## SERVICE MUT. INS. CO. OF TEXAS v. VAUGHN et al.

### No. 3477.

Court of Civil Appeals of Texas. Beaumont.

June 10, 1939.

Rehearing Denied June 21, 1939.

W. E. Cureton and Tom P. Scott, both of Waco, for appellant.

Glenn Faver, of Jasper, and J. Austin Barnes, of Beaumont, for appellees.

WALKER, Chief Justice.

This is a workman's compensation case, filed by appellant, the Service Mutual Insurance Company of Texas, in the district court of Jasper County as an appeal from the final award of the Industrial Accident Board; appellees, Mrs. J. C. Vaughn and her minor daughter, Bernice Vaughn, the compensation claimants, are the surviving widow and daughter of the deceased employee, J. C. (Carl) Vaughn; A. L. Mays was the employer. The trial was to a jury. After overruling appellant's motion for an instructed verdict, and after the verdict was returned, the motion for judgment non obstante veredicto, judgment was entered in appellees' favor for compensation in the sum of $3,246.18, to be paid in a lump sum. The jury found the following facts: On or about the 27th day of August, 1938, "in the course of his employment for his then employer, J. C. Vaughn sustained an injury" by "being struck over the head" by Joe Hopkins which "naturally resulted in his death."

The jury gave a negative answer to the following question: "Do you find from a preponderance of the evidence that the sole motive for Joe Hopkins killing J. C. Vaughn (if he did kill J. C. Vaughn) was the feeling existing because of the separation of Joe Hopkins and his wife, Pauline Hopkins?"

Additional facts were found sufficient to support the judgment. Appellant has regularly prosecuted its appeal to this court.

On the undisputed evidence, it is our conclusion that the court should have granted appellant's motion for an instructed verdict in its favor, and on the return of the verdict, its motion for judgment non obstante veredicto. We give appellees' summary of the facts:

"While J. C. Vaughn was on duty, alone on a lonesome road, in the course of his employment, in the furtherance of his master's business, working as a night watchman, watching road machinery, he was killed by Joe Hopkins, who (about 10 o'clock at night) slipped out of the darkness, behind a tree against which J. C. Vaughn was sitting, and struck him in the head with a hammer. Joe Hopkins was J. C. Vaughn's son-in-law. Joe Hopkins and J. C. Vaughn's daughter had been having marital troubles for many, many months. Mrs. Hopkins had left Joe on several different occasions. Several weeks before Mr. Vaughn met his death, Joe Hopkins threatened to kill J. C. Vaughn, the father of his wife. However, Joe Hopkins threatened to kill many people, particularly the members of the J. C. Vaughn family, and particularly Nancy Christian, a member of that family. There were eleven children in that family, all living and all above twenty-one years of age except one. There was but one night watchman, and that night watchman was the only one of the family killed by Joe Hopkins. * * * Three times were Joe Hopkins and his wife separated. They were separated before Mr. Vaughn ever began working as a night watchman. * * * During these troublesome days Joe Hopkins and J. C. Vaughn were seen together 'from time to time up until the date of this tragedy'. None of the other members of the large family were ever injured because of the separation. Mr. Vaughn was never injured because of the separation, or otherwise, until Joe Hopkins found J. C. Vaughn on a lonesome high-

way, guarding machinery at 9:30 o'clock at night, where no light shed any kind of protection, but where darkness lurked everywhere, * * *. From day to day, even after the last separation, Joe Hopkins and J. C. Vaughn were together. No harm was done until J. C. Vaughn was found on a night watchman's job. Until J. C. Vaughn was found on a lonesome, unlighted, country place as a night watchman, all alone, he and Joe Hopkins, in meeting often, acted as if they were friends and acted in a friendly manner, even on Thursday before the final day. Joe Hopkins was with J. C. Vaughn on Thursday and on Friday, and on each occasion they were talking in a friendly way. * * * Every opportunity was available for Joe Hopkins to kill J. C. Vaughn during the day preceding the murder. * * * Joe Hopkins threatened numerous people. He threatened to kill Mr. Dickerson. He threatened to kill Mr. Maxwell. He threatened to kill many others. None of these men were working as a night watchman. * * * None of them were killed. Mr. Vaughn, on the lonely, unlighted highway job, working as a night watchman, alone, was murdered by Joe Hopkins. * * *

"On Thursday before the fatal Friday, Joe Hopkins went to J. C. Vaughn's home and visited Mr. Vaughn for ten minutes, but did him no violence. On the following Friday he was also visiting J. C. Vaughn and did him no violence. It was on Friday night, in the darkness, when J. C. Vaughn was all alone * * * that he met his death at the hands of an assassin."

Opinion.

 It was shown without controversy that J. C. Vaughn, while discharging the duties of his employment, was murdered by Joe Hopkins. The evidence does not support the jury's finding that the injury which resulted in Vaughn's death was "sustained in the course of his employment." Article 8309, R.C.S., a section of our Workmen's Compensation Act, declares that the term "injury sustained in the course of employment" shall not include: "An injury caused by an act of a third person intended to injure the employe because of reasons personal to him and not directed against him as an employe, or because of his employment."

Under all the evidence, Hopkins killed Vaughn because of reasons personal to him, that is, because of the feeling he

had against Vaughn caused by the refusal of his wife, Vaughn's daughter, to live with him. He did not kill Vaughn because of anything he had against him as an employee of Mays, nor because he was employed by Mays; nor was he induced to go to the place of the homicide because of some motives such as robbery, arson, etc., directed against Mays, nor the business operated by Mays. He went to the place of the homicide simply to kill Vaughn, and to kill him, as stated above, solely for reasons personal to him. Every element of the motive that induced Hopkins to kill Vaughn was, man to man, between Hopkins and Vaughn, and had no relation whatever to Vaughn's employment. Hopkins was not an employee of Mays, but a stranger to him and to his employment. If Hopkin's wife had been the daughter of some other man, he would not have killed Vaughn. If he and his wife had not been separated, if they had been living happily together, he would not have killed Vaughn. The irresistible logic of the facts is that Hopkins killed Vaughn because he was Vaughn's son-in-law, and not because of anything connected with Vaughn's employment. In discharging the duties of his employment, Vaughn assumed no greater hazard, by reason of his employment, than other night watchmen engaged in the same character of work. The authorities, as we understand them, sustain our construction of the statutory exclusion to the definition of "injuries sustained in the course of employment," put in issue by the uncontroverted facts. We have found no Texas case directly in point, but the Court of Appeals of Kentucky had the very point before it in January-Wood Co. v. Schumacher, 231 Ky. 705, 22 S.W.2d 117, 119. The court said: "The fundamental principle of liability, it seems to us, is that the injury sustained was such as in the light of experience might reasonably have been foreseen as a result of the service and nature of duties performed (28 R.C.L. 786, 805), or the cause must have had its origin in a risk connected with the employment and the injury have flowed from that source as a rational consequence. * * * In the instant case the personal animosity of Eddings was the direct cause of the employee's death. He did not kill Schumacher because he was the company's night watchman on duty, but because he was the husband of his paramour. Does the fact that his duty put him in such a place as gave his murderer an opportunity to carry out his nefarious design with less probability of apprehension than if he did so elsewhere constitute such causal relation as to bring the result within the term 'arising out of his employment'? We hardly think so, on both reason and authority."

On the authority of that case, it is our conclusion that there must be a direct causal connection between the employment and the injury, such as robbery, arson, or some other motive inducing the marauder to enter upon the employer's premises. In Cherry v. Magnolia Petroleum Co., Tex.Com. App., 45 S.W.2d 555, it was held that an employee, who turned from his employment to make an unjustified assault upon another was not entitled to compensation for injuries received in the assault. In Texas Indemnity Ins. Co. v. Dunlap, Tex. Civ.App., 68 S.W.2d 664, it was held that an employee, the aggressor in horse play, was not entitled to compensation for the injuries received by him. In Slusher v. Fire Department, City of Pontiac, 284 Mich. 657, 280 N.W. 78, the Supreme Court of Michigan held: "Where one employee assaults another solely to gratify his feeling of anger or hatred, injury results from voluntary act of assailant and does not 'arise out of employment,' but when an employee is assaulted while defending his employer or his employer's property or interests, or when assault is incidental to some duty of employment, resulting injuries generally 'arise out of employment.' Where there was no proof of any disagreement over their work between deceased fireman and captain in charge of fire station, death of fireman while peeling potatoes resulting from unexplained shooting of fireman in the back of the head by captain, who thereupon committed suicide, did not 'arise out of employment,' and was not compensable."

In McConnell v. Lancaster Bros., 163 Tenn. 194, 42 S.W.2d 206, the Supreme Court of Tennessee held that the death of an employee, growing out of a quarrel not connected with his employment, was not compensable as "arising out of employment."

Appellees support their judgment by the following argument:

"It was only because of the employment, when Joe found Vaughn especially exposed, that the killing occurred. * * * Did Joe Hopkins kill J. C. Vaughn or injure him in the daylight on Friday afternoon when with him alone? He certainly did

not, and even refused to indicate a desire so to do. Did Joe Hopkins injure J. C. Vaughn when he was with Vaughn in his home on Thursday before the killing on Friday night? Why did not he injure Vaughn then? That was during the period of separation and after the second separation. Why did Joe Hopkins go to the lonely night watchman and commit the murder? It was because Vaughn's job and his position contributed to the effectuation of Joe Hopkin's designs. His place of work and the nature of his work furnished an opportunity for the injury. In other words, Vaughn's work contributed to the effectuation and furnished the opportunity which caused the death. The employment contributed to the risk in question, if there were any risk for him to be thrown with Joe Hopkins as other people were. If that danger existed, the undisputed evidence shows conclusively here that the employment contributed to the risk, in that, time after time the opportunity was presented for Joe Hopkins to do violence to Vaughn, but he never did, and he never would until he found Vaughn where the risk was greater than the risk at other places and at other work, and where there was a special exposure to the peril, if any there obtained. Did the environment at J. C. Vaughn's home on Thursday contribute to the risk under which Vaughn was living? We proved by positive testimony that it did not. Did the place and position where Vaughn and his son Carl met Joe Hopkins and talked, until Carl went away, on Friday afternoon contribute to the risk? The positive evidence showed that it did not. Joe Hopkins said that he was with Vaughn from day to day and from time to time up until the time of his death. Joe Hopkins if he killed the old man, did not kill him and would not kill him until he found him alone, specially exposed, where the danger was accentuated and increased, where crime and violence flourish, under cover of night and darkness. That was the very reason that Vaughn was a night watchman, watching constantly through the long hours of the night. The risk, if there were any aside and apart from the night watching position, was common to the entire Vaughn family, and possibly, as shown by the evidence, to others. That risk was accentuated by the incidence of the employment of J. C. Vaughn. That risk was magnified by the special exposure to peril suffered by anyone on a night watching job. That night watching employment directly contributed to the risk by added exposure to the common peril. * * * Is there any evidence here that Joe Hopkins would kill J. C. Vaughn except where he was alone on his night watching job? Joe Hopkins' decision to strike down Mr. Vaughn was based, the evidence shows, upon the realization that he was working as a night watchman, far out in the country, alone, unprotected, hovered about by darkness, where crime naturally lurks and where Joe thought the act could be done because of the employment with impunity. Mr. Vaughn was picked out and killed, as the evidence conclusively shows in this case, because he was a night watchman, and therefore, because of his employment. * * * J. C. Vaughn was killed because of his employment. Now, if Joe Hopkins had had antecedent malice to such an extent and if it were shown by the evidence that that malice was of such a nature as would cause Joe Hopkins to follow J. C. Vaughn where he found him and inflict injury upon him wherever he was found, then, of course, there would be a different situation presented to this Court. Here, we are not faced with such a situation. Joe Hopkins and J. C. Vaughn were together every day. On Friday before night came on, they were together alone. On Thursday they were together with only Mrs. Vaughn present, and with the driver outside. Such antecedent malice did not obtain. * * * He struck Vaughn down and killed him because he was a night watchman and because of the nature of his work and because of his employment. About that there is no question. * * * The controlling question is would Joe Hopkins kill Mrs. Vaughn, or any one of the eleven other members of the Vaughn family, or even J. C. Vaughn himself so long as he was not alone on the night watching job, covered by darkness, with risks accentuated, with the hazards obtaining increased and with the lonely night work affording the opportunity for the crime with the hope that apprehension would not result thereafter."

The authorities cited by appellees do not support their argument. In all the cases cited by them, there was a causal connection between the employment and the injury in issue. In Vivier v. Lumberman's Indemnity Exchange, Tex.Com.App., 250 S.W. 417, and Southern Surety Co. v. Shook, Tex.Civ.App., 44 S.W. 425, the causal connection was robbery. In the Dunlap Case and the Cherry Case, cited above, compen-

**396**

sation was denied. Texas Employers' Ins. Ass'n v. Sparrow, 109 S.W.2d 1137, and Petroleum Casualty Co. v. Kincaid, 93 S.W. 2d 499, were decided by the Courts of Civil Appeals—the Sparrow Case by this court— on the theory of a direct causal connection between the employment and injury; writs of error were granted in both these cases.

The facts were fully developed. There is no suggestion by appellees that they could strengthen their case on another trial. There is no suggestion in the record of any fact omitted by appellees in making out their case. It follows that the judgment of the lower court must be reversed and judgment here rendered in favor of appellant, and it is so ordered.