TEXAS EMPLOYERS INSURANCE ASSOCIATION V.
STEVE SPARROW ET AL.

No. 7370. Decided November 22, 1939.
Rehearing o'verruled February 7, 1940.
(133 S. W., 2d Series, 126.)

*Royster & Rayzor* and *Robert Eikel, Jr.,* all of Houston, for plaintiff in error.

It is error for the Court of Civil Appeals to hold that there was any evidence to support a finding by the jury that Allen Sparrow did not meet his death at the hands of a third person who intended to injure the deceased personally because of a dispute that arose between them, and which had nothing to do with his employment, and was at a place other than on the property of his employer, and over a matter not connected with his duties as an employee of the company. Cherry v. Magnolia Pet. Co., 45 S. W. (2d) 555; Harris v. Texas Emp. Ins. Assn., 257 S. W. 998; Texas Ind. Co. v. Dunlap, 68 S. W. (2d) 664.

*Elton Cruse* and *C. W. Howth,* both of Beaumont, for defendant in error.

The evidence in the instant case was sufficient to raise and support a favorable finding by the jury that the injury to the deceased was sustained in the course of his employment with the stevedoring company. Lumberman's Reciprocal Assn. v. Behnken, 112 Texas, 103, 246 S. W. 72; Casualty Reciprocal Exchange

v. Parker, 12 S. W. (2d) 536; Southern Surety Co. v. Shook, 44 S. W. (2d) 425.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

This is a compensation case, in which the beneficiaries of Allen Sparrow, deceased, were claimants, and they will be referred to as plaintiffs. Allen Sparrow was the employee. Texas Employers Insurance Association was compensation carrier and will be designated defendant. Southern Stevedoring & Contracting Company of Texas will be referred to as employer. The question for decision is: Was Allen Sparrow killed while in the course of his employment within contemplation of the Compensation Laws? The facts upon all essential particulars are undisputed. They are substantially as follows:

Sometime in October, 1935, longshoremen affiliated with the International Longshoremen's Association went upon a strike and ceased work upon the city docks at Beaumont. Thereupon the various steamship companies doing business at Beaumont incorporated themselves into what was known as the Beaumont Maritime Association, Inc. The Bull Steamship Company was a member of this Association. The stevedoring companies, of which there were a number, including Southern Stevedoring & Contracting Company, were not in any way affiliated with the Beaumont Maritime Association, Inc. The Maritime Association proceeded to contract with what was known as the Independent Longshoremen's Association Local No. 68011 to obtain laborers from this association to load and unload vessels belonging to members of the Maritime Association. Thereafter the Maritime Association brought a large number of the members of the Independent Longshoremen's Association to the city docks and made arrangements to house and feed them there. They were housed and fed in box cars or bunk houses placed upon railroad tracks along by the side of the docks. None of the persons or companies doing stevedoring had anything to do with the housing and feeding of these longshoremen. On account of conditions arising from the strike most of those connected with the Independent Longshoremen's Association remained upon the docks night and day, although they were left free to go and come at their will; and the testimony shows that about one-fifth of those belonging to that Association did go and come to the docks while doing work. For the convenience of those who did stay upon the docks the Maritime Association, through its secretary, had

a telephone installed at a point on the docks near where the longshoremen were quartered. This was what was known as a public pay telephone, and those of the longshoremen who used it paid a small charge. The Southern Stevedoring & Contracting Company had nothing whatever to do with the installation or supervision of this telephone.

In the steamship business at the time in question the loading and unloading of vessels was conducted in the following manner: The steamship companies owned and operated the vessels. When necessary to load or unload a vessel, the Maritime Association, through its secretary, or occasionally the individual steamship company, contracted with some stevedoring concern to supervise the loading and unloading. This was the primary business of a stevedore. The longshoremen were the ones who did the actual labor. The Bull Steamship Company, although a member of the Maritime Association, appears to have made its own stevedoring contracts, and usually contracted with Southern Stevedoring & Contracting Company for that purpose. There were numerous other stevedoring concerns doing work upon the docks for various other steamship lines. It appears that most of the stevedoring companies drew upon the Independent Longshoremen's Association for men to do the work of loading and unloading vessels. The practice seems to have been that the steamship line or company, sometimes individually and sometimes through the Maritime Association, would contract with an individual stevedoring concern for the loading or unloading of a particular vessel. The stevedoring company would then call upon the secretary of the Independent Longshoremen's Association to furnish said stevedore with one or more crews of men, which crews would be in charge of a separate boss. One R. N. Adams acted as secretary and time-keeper for the Longshoremen's Association. The Steamship Company, upon completion of the work contracted to be done, would pay the stevedoring company the amount agreed upon. The stevedore would then pay to Adams the wages due the various longshoremen who had been employed to do the actual work. Adams would deduct the amount, if any, due by the individual longshoremen to the Maritime Association for meals during the time he was at work. He would then in turn pay to the foreman or boss in charge of each crew the aggregate amount due such crew, and the boss of the crew would then distribute to the respective longshoremen the amount due each. A small amount was deducted to pay expenses of the Independent Longshoremen's Association and the services of the time-keeper or secretary.

The longshoremen worked by the hour. They appear to have worked when they pleased and laid off when they pleased. They worked at different hours during the day and night. They worked for different stevedores and upon different boats from time to time. The record of work done by Allen Sparrow during the forty-eight hours preceding his death is probably representative of the method of working. Beginning at 7:15 p. m. of November 16th he worked till 8 p. m. He then began at 8:30 and worked till 12 p. m. Beginning again at 7 a. m. on the 17th he worked till 12 noon. Then beginning at 1 p. m. he worked till 6 p. m. Starting again at 8:30 he worked till 12:45 a. m. of the 18th. Beginning at 7 a. m. of the 18th he worked till 12 noon. Then beginning at 2:15 p. m. he worked till 6 p. m. He was killed about 7 p. m. of that day, as hereinafter set forth. On the 18th of November and for a number of days theretofore Sparrow had been working on a boat belonging to the Bull Steamship Line known as Jean. The Southern Stevedoring & Contracting Company had a contract with the Bull Steamship Line to unload and load the Jean. On the 18th he was a member of a crew of 21 laborers of which crew William Munford was boss. After working in the manner above indicated, Sparrow along with other members of the crew, quit work at 6 p. m., for supper. There is nothing to indicate that Sparrow intended to return to work after getting his meal. The secretary, Adams, testified that the men usually worked until they got tired or burned out. He further testified that eight of the crew in which Sparrow had been working did not go gack to work at 7:30 p. m. that evening, but fresh men took their places. As indicated, Sparrow had worked during the preceding forty-eight hours a total of 27 hours and 15 minutes, a considerable portion of which time was at night. During the day on which Sparrow was killed another longshoreman by the name of Washington Jackson had been working for another stevedoring company on a vessel owned by the Lykes Brothers Steamship Line. Apparently most of these longshoremen had eaten their supper, including Sparrow, and were lounging around the docks in the neighborhood of the telephone which had been installed by the Maritime Association. A short time before 7 o'clock the telephone rang and one Dewey White, who had worked that day on the steamship—Narbo—with Jackson, answered the telephone. White heard a woman's voice on the telephone, who requested that Jackson be called to the phone. He was called and had a conversation with someone for a considerable length of time. While Jackson was talking Sparrow was some distance away near

Adams, the secretary, and one Green, who had been working that day with Jackson. He inquired of Adams to know if there was a time limit on the use of the phone, and Adams replied that there was a limit of five minutes. There was a conflict in the testimony as to what was then said and done, but it seems to be reasonably certain that Sparrow said nothing to Jackson, and that when Jackson left the telephone he walked by Sparrow and stabbed him with a knife. As a result of the wound Sparrow later died. There was considerable testimony tending to show animosity on the part of Jackson toward Sparrow, on account of personal matters, but it seems to us that all of this is immaterial.

In the trial court judgment was in favor of plaintiff against Texas Employers Insurance Association, based on a finding that Sparrow was killed in the course of his employment as an employee of the Southern Stevedoring & Contracting Company. This judgment was affirmed by the Court of Civil Appeals. 109 S. W. (2d) 1137.

At the threshold of our discussion we are met with the serious question of whether or not Sparrow was an employee of Southern Stevedoring & Contracting Company. We are confronted with this inquiry, because it seems to us certain that he had such relation to the Bull Steamship Line as to come under the protection of its compensation contract. The Bull Steamship Line was a member of the Beaumont Maritime Association, Inc. That Association owned no vessels, but was merely the representative of its constituent members. The contract between the Beaumont Maritime Association, Inc., and the Independent Longshoremen's Association Local No. 68011 was in writing. In that contract the Maritime Association was called party of the first part, and among other things it contracted as follows:

"The Party of the First Part agrees to give all of its Deep Sea Stevedoring work at the Port of Beaumont to the Party of the Second Part, beginning at 8:00 A. M., October 17, 1935, up to and including March 31, 1937, on conditions and terms hereinafter set out."

In pursuance of that contract, and to aid in its fulfillment, the Maritime Association made arrangements for lodging and boarding the members of the Independent Longshoremen's Association on the docks. It then brought some two hundred of these members, under police protection and inclosed conveyances, to the docks, where they were quartered. When the Maritime Association made the contract mentioned, its mem-

bers knew that they had to contract in light of the regulations governing the loading and unloading of vessels;—that is through the intervention of a stevedore or stevedoring company. In the fulfillment of this contract with the Independent Longshoremen's Association they therefore left no freedom of contract on the part of the Stevedoring Company. In other words, the Bull Steamship Line, as a constituent member of the Association, could not allow the Southern Stevedoring & Contracting Company to contract with any one else for the actual work of loading and unloading its vessels without breaching this contract with the Independent Longshoremen's Association. The Southern Stevedoring & Contracting Company could not therefore be an independent contractor. As the Bull Steamship Line knew that it could not get the benefit of the services of these men, as contracted for, without the intervention of a stevedore, it necessarily constituted such stevedoring company its agent for employing members of the Longshoremen's Association to do the work of loading and unloading its vessels. The fact that the Maritime Association maintained the lodging quarters for these men, and provided meals for them, was a clear recognition that they were its employees, at least to such extent that they had to rely upon their services alone for the loading and unloading of vessels. If the compensation carrier of the Bull Steamship Line were before us we would be strongly inclined to hold that as to it Sparrow was killed while in the course of his employment. Unfortunately, however, for the plaintiffs the trial court gave an instructed verdict as to such carrier, and plaintiffs have prosecuted no appeal from that part of the judgment.

While it appears that an anomalous situation would be created by such an assumption, yet for the purpose of decision of this case as it is now presented we shall assume that Sparrow was an employee of the Southern Stevedoring & Contracting Company when he was killed.

After a very careful review of all the facts of the case, in light of practically all authorities, we are driven to the conclusion that Sparrow at the time of his unfortunate death was not in the course of his employment with the Southern Stevedoring & Contracting Company. By no course of reasoning can we distinguish this case from that line of cases involving injuries to employees while at their own homes or private boarding houses during meal hours. Even in cases where the employer himself furnishes a boarding or lodging place, absent a requirement of the terms of his employment, or as necessarily incidental thereto, that he lodge in said quarters, he is

ordinarily not entitled to compensation for an injury at such place. In this instance, the Southern Stevedoring & Contracting Company had nothing whatever to do with the furnishing of the lodging and eating quarters of the men, but same were furnished by the Maritime Association alone, and it was paid therefor. In addition, Sparrow was not required to stay at said quarters. The proof is undisputed that at least one-fifth of the longshoremen left the docks and returned to the docks in the performance of their work. It is further true, as indicated above, that Southern Stevedoring & Contracting Company had nothing to do with the installation of the telephone and had no control over same or the use of same. Nor were Sparrow and Jackson co-workers, so far as the Southern Stevedoring & Contracting Company was concerned. If the injury does not arise in the course of employment, when an employee is injured at a bunk house or other lodging place furnished by an employer, except under conditions mentioned above, how can it be reasonably held that the injury is compensable when the employee is injured at a lodging place of his own choosing and not furnished by his employer? Our authorities, as well as many others, conclusively determine that there can be no recovery. Wallace v. Texas Indemnity Ins. Co., 94 S. W. (2d) 1201 (Writ ref.); Associated Employers Reciprocal v. Simmons, 273 S. W. 686; London Guaranty & Accident Co. v. Smith, 290 S. W. 774 (Writ ref.); Texas Indemnity Ins. Co. v. Clark, 125 Texas 96, 81 S. W. (2d) 67; Moore v. Sefton Mfg. Cor., 82 Ind. App. 89, 144 N. E. 476.

The question is forcefully and fully discussed in the case of Guiliano v. Daniel O'Connell's Sons, 105 Conn. 695, 136 Atl. 677, 56 A. L. R. 504. Particular reference is made to that case, as well as numerous authorities cited at pages 1255 and 1256 of 31 A. L. R.

The judgment of the Court of Civil Appeals is reversed. The judgment of the district court as to plaintiff in error Texas Employers Insurance Association is reversed, and the cause as to it is remanded. The judgment of the district court as to Travelers Insurance Company, the compensation carrier for the Bull Steamship Line, is unaffected.

Opinion adopted by the Supreme Court November 22, 1939.

Rehearing overruled February 7, 1940.