### ERWIN v. TEXAS EMPLOYERS' INS. ASS'N.
### No. 2889.

Court of Civil Appeals of Texas. El Paso. Oct. 12, 1933.

Rehearing Denied Nov. 2, 1933.

Jones, Goldstein, Hardie & Grambling, of El Paso, for appellant.

Lea & Edwards, of El Paso, for appellee.

WALTHALL, Justice.

This suit was brought by Maude A. Erwin, widow of Clarence E. Erwin, against Texas Employers' Insurance Association, to recover compensation under the Workmen's Compensation Law of this state (Rev. St. 1925, art. 8306 et seq., as amended), growing out of the death of the said Clarence E. Erwin.

Clarence E. Erwin died as a result of a gunshot injury inflicted on him by a negro, Milton Lott, about 4:30 o'clock on the morning of August 23, 1932. At the time Clarence E. Erwin was shot he was in the employ of the Midwest Dairies, Inc., which company carried a workmen's compensation insurance policy with appellee, Texas Employers' Insurance Association.

The one and only issue presented on this appeal is whether or not, under the evidence presented on the trial, the injury received by Clarence E. Erwin is compensable under the Workmen's Compensation Law of this state.

The case was tried to a jury, and at the conclusion of the evidence the court instructed a verdict for the appellee. The action of the court in instructing the verdict was duly excepted to by appellant and notice of appeal given.

Appellant's motion for a new trial was overruled, to which appellant duly excepted and prosecutes this appeal.

#### Opinion.

Appellant presents several propositions, but all to the effect that the evidence was such as to require the case be submitted to the jury.

The following facts were stated in writing and agreed to on the trial:

On August 23, 1932, Clarence E. Erwin was an employee of Midwest Dairies, Inc.; that on that date the Midwest Dairies, Inc., was doing business in El Paso, Tex. with more than three employees, and at that time was carrying a policy of workmen's compensation insurance previously issued by the Texas Employers' Insurance Association in standard form, and in all respects complying with the requirements of the Workmen's Compensation Act of Texas; that on said date said policy was in full force; that all notices of the injury to Clarence E. Erwin were duly given and the result of said injury, and that within the time required by law appellant duly made claim for compensation against appellee through the Industrial Accident Board for more than $500; that on January 2, 1933, the Industrial Accident Board made and entered into its final ruling, decision, and award, on said claim, and that appellant, being unwilling to abide by said ruling and award, duly gave notice to said board of her unwillingness to abide by said award, and that appellant would appeal therefrom, and that thereafter, and in due time, appellant filed this suit to set aside said award and to recover compensation.

The following evidence in question and answer form is before us. The evidence is whol-

ly uncontradicted, and for brevity we will, in substance, state the material facts in narrative form.

Dr. Will P. Rogers qualified as a physician; was called to attend Clarence E. Erwin about 4:30 a. m. on August 23, 1932; found him suffering from a gunshot wound, from which he died about 1 o'clock on August 25, 1932. Witness asked Erwin how it happened, and he said, "This negro came up and hollered at him, 'where are we, boy,' or words to that effect," and "he (Erwin) had resented him speaking to him in that manner." Said "he told the negro he resented his tone of voice and manner." Erwin was then desperately sick, said he was dying and was. Erwin died from the injury.

Rogan Woodrow Regan, a witness for appellant testified on direct examination: Was 16 years old; appellant is his aunt; was on a visit to his aunt in August, 1932; remembers the circumstances in which his uncle, Clarence E. Erwin, was shot, in August, 1932; was with his uncle at the time; it occurred about 4:30 in the morning at the corner of Silver and Piedras streets in El Paso, Tex.; on that morning his uncle was delivering milk for the Midwest Dairies; in delivering the milk he used a wagon and one horse; witness was going on the milk route with his uncle on that morning; the route took in Manhattan Heights; his uncle loaded his wagon with bottles of milk at the plant on Piedras street and went on his route; the last house at which milk was delivered that morning was on the north side of Silver street near the corner of Silver and Piedras streets; after that delivery witness and his uncle went on to the corner of said two streets and stopped at the corner; they left the horse and wagon at the curbstone at the corner; they got out of the wagon, sat down on the curb, and drank some milk. While sitting there, two negroes drove up in a car and stopped; one of the negroes asked witness' uncle, "Where are we at, boy?" witness' uncle did not answer; they asked him again; witness' uncle went up to the car door and asked them what they wanted; the negro in the back seat said "he just wanted to know where we are." He (the uncle) said: "Where do you want to be?" The negro in the front seat said: "Four thousand block." Witness proceeding, said: "My uncle went back to the wagon and got an empty milk bottle and came between the horse and the car, and the negro in the back seat told the driver, said, 'start the motor and let's go.'" The driver started the motor. "When he (Uncle) saw they were going to leave he just stopped, and this negro and driver, he got a gun from somewhere and he turned around and put his hand across the back of the seat and says: 'You think you are so God damn smart,' and he shot him." Witness said his uncle was not angry or excited. He said, "They got me," and "Get the license number." Witness thought the negroes were under the influence of liquor.

On cross-examination witness said: Could see that the men in the automobile were negroes and not white men. Had finished drinking the milk when the negroes came. We were sitting on the curb facing Piedras street; the street is about sixty feet wide, and the street car tracks are in the middle of the street; the negroes' car straddled the right-hand street car track. When the negroes drove up, one of them in rather an insolent manner said, "Where is we at, boy"; to the first inquiry we made no reply, then the one on the front seat, Milton Lott, repeated the question. When the question was repeated, uncle got up from where he was sitting and walked over to this automobile and opened the front door; witness went with his uncle to the car. Witness' uncle said: "Well, where do you want to be at?" The negro in the back seat said: "I just wanted to know where I was at." Witness said some further conversation took place between his uncle and the negro on the front seat witness did not hear. Uncle went to the milk wagon, picked up an empty milk bottle, holding it by the neck, and was standing still when the negro shot him. When witness' uncle went back to get the milk bottle, witness remained where he was; was about five feet from his uncle when he was shot. Witness' uncle was born in Mississippi and moved to Arkansas.

T. J. Robinson testified: Was office manager for the Midwest Dairies, Inc.; knew Clarence E. Erwin. He was, and for some time previous to his death had been, one of the "milk drivers" for the Midwest Dairies, Inc.; his territory was along Piedras street, Manhattan Heights; he delivered milk to the retail trade and handled his route in the city of El Paso. Witness testified at length as to the compensation paid Erwin by the Midwest Dairies, Inc., which we need not state.

L. T. Robey, chief of police of the city of El Paso, testified: "There has been more major crimes (on the streets of El Paso) during the night time than there is in the day time, particularly after midnight, and has been more assaults on people who were on the streets after midnight, during the year of 1932. To prevent that crime we have more cars, more policemen working those hours than we do in the day time."

Mrs. Clarence E. Erwin, appellant, testified: Is the widow of Clarence E. Erwin; was married in Mississippi in 1916. She and her husband were living together as husband and wife on August 23, 1932, when he was shot by a negro on Silver and Piedras streets. She has no children. Testified as to his duties in delivering milk on his route as salesman for the Midwest Dairies, from about midnight to about 6 o'clock in the morning. She testified as to other insurance policies carried by her husband; said her husband "was of a

quiet, even temperament"; recalled a "milk bottle fight" he had about 3 years ago, and in which "he received an injury to his jaw from a blow from a milk bottle."

H. L. Griffin testified: 'Is sales manager for Midwest Dairies; testified as to Erwin's duties in delivering dairy products, collecting and soliciting his route and the hours engaged; "at night he delivered the milk and picked up his empty containers until six o'clock in the morning"; said it was the general habit of the milkmen, after they had made part of their run, to stop and rest, and that is with the company's consent.

Witness Rogan Woodrow Regan recalled and testified: "When the two negroes drove up and first addressed us it was in a surly tone of voice"; it sounded insolent to witness and his uncle; just before the negro, Lott, fired the shot, he said, "You think you are so God damn smart."

The above statements of the witnesses are not contradicted or questioned and are the facts in the case.

■ The law applicable to the undisputed facts of this case, as disclosed by the evidence, is found in article 8309 of the Revised Civil Statutes. By express provision of the statute an "injury sustained in the course of employment," as used in the Workmen's Compensation Law, does not include "an injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment." As we view the evidence, there is not the slightest suggestion in the evidence that the negro, Milton Lott, shot Clarence E. Erwin because Erwin was "an employee," or "because of his employment," but rather because of reasons personal to him, Milton Lott. The evidence does not indicate, except by inference, that the negro, Lott, knew Erwin was an employee of the Midwest Dairies, Inc., or in any employment, but the evidence does clearly indicate to us that the injury to Erwin was inflicted because of reasons personal to the negro, Lott.

To entitle appellant to compensation, the evidence should tend to show an injury to Clarence E. Erwin of a kind and character "having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer." Article 8309, R. C. S.

We think the evidence does not tend to show that the circumstances under which the gunshot injury to Erwin was received "had to do with and originated in the work, business, trade or profession of" the Midwest Dairies, Inc., nor does the evidence, in our opinion, tend to show that the injury to Erwin was received by Erwin while he was engaged in or about the furtherance of the affairs or business of the Midwest Dairies, Inc. There is, it seems to us, no intimation in the evidence of any fact or circumstance remotely involving or referring to Erwin as an employee, or his employment, or the Midwest Dairies, Inc., or its business. The evidence, it seems to us, fails to meet the proof necessary to entitle appellant to receive compensation from appellee for the injury to Clarence E. Erwin.

■ The rule is now well established in this state that an injury has to do with and arises out of the work or business of the employer, so as to be an "injury sustained in the course of employment" within the Workmen's Compensation Act, when it results from a risk or hazard which is necessarily or ordinarily or reasonably inherent or incident to the conduct of such work or business. Federal Surety Co. v. Ragle, 40 S.W.(2d) 63, and the cases referred to by Judge Sharp of the Commission of Appeals, as sustaining the above statement.

While Erwin was on his route in delivering milk and collecting the empty bottles in the line of his duty, we think he may not voluntarily and unnecessarily leave his seat on the curb of the sidewalk, go to the automobile, and open the door and engage in a conversation with the occupants, and, because of some real or fancied surly tone of voice in which he was addressed prior to or at the time he was at the open car door, then go to his milk wagon and take therefrom an empty milk bottle and hold it by the neck in a threatening manner, and, when an injury is inflicted at that very moment, we think it cannot be said the injury resulted from a risk or hazard necessarily or ordinarily or reasonably incident to the conduct of the work or business of delivering milk to the trade and gathering up the empty bottles.

From the statement of the witness Regan, Clarence E. Erwin and witness Regan each heard and understood the words of the negro in the automobile in making the inquiry, "Where is we at, boy?" and that the inquiry was made "in a rather insolent sort of manner," and when the same was repeated Erwin and witness voluntarily and unnecessarily left the place they were sitting and went to the car door when Erwin opened it and engaged the negroes in conversation and followed it up by getting the empty bottle from the milk wagon as above stated.

■ The facts, as stated, were undisputed. As we view it, when the evidence is all in and there is no controverted issue of fact, the issue then is one of law, and the court could, as here, withdraw the case from the injury, and enter judgment as the court found the law to be.

We have concluded the court was not in error, under the undisputed facts, in instructing the verdict in favor of appellee.

The case is affirmed.