**COMMERCIAL STANDARD INSURANCE
COMPANY et al., Appellants,**

v.

**Raul MARIN, Jr., Appellee.**

No. 15062.

Court of Civil Appeals of Texas,
San Antonio.

Nov. 22, 1972.

Rehearing Denied Dec. 27, 1972.

Clemens, Knight, Weiss & Spencer, Carter, Callender & Branton, Jonathan Sox, San Antonio, for appellants.

Johnson & Christopher, Henry W. Christopher, Jr., San Antonio, for appellee.

CADENA, Justice.

This is a workmen's compensation case in which the trial court ordered the payment of benefits for the death of Santa Emily Marin, an employee of Sigmor Shamrock Services Stations, who was raped and murdered in the darkness of the early morning hours of Sunday, September 14, 1969, as she was in the process of performing her duty as an employee to open her employer's service station for business. The judgment ordering payment of compensation to her surviving husband, Raul Marin, Jr., the appellee here, was based on a jury finding that she died as the result of injuries received in the course of her employment.

The appellant's compensation insurance carrier, Commercial Standard Insurance Company, referred to in this opinion as "Commercial", assails, by way of no evidence and insufficient evidence points, the finding that Mrs. Marin was injured in the course of her employment. The other appellants, Silvestre Casares and wife, Juanita Casares, surviving parents of the deceased employee, while expressing no dissatisfaction with the "course of employ-

ment" finding, contend that they should be the recipients of the compensation payments because appellee, the surviving husband, had abandoned the deceased employee and refused to support her.

On the day of her death, Mrs. Marin's duties required that she open the service station for business at 7:00 a. m. She arrived at the station prior to 7:00 a. m. and parked her car at the place where she normally parked it on her employer's premises. It is undisputed that she was raped and murdered, before she opened the station for business, by Esteban Mendoza, who was employed at a junkyard adjacent to the filling station premises, and who later pleaded guilty to a charge of murder.

The only evidence concerning the manner in which Mrs. Marin met her death is found in the deposition of the killer and in his confession. Mendoza's accounts of the murder are inconsistent. There is evidence which would support a finding that Mrs. Marin and Mendoza had known each other in the past and had engaged in sexual relations; that on the day of the homicide she had willingly accompanied him to the junkyard, where they had previously made love; and that he killed her because he became enraged when she spurned his offer of marriage and announced that she was going to marry someone else, although at the time she was married to appellee. However, it is clear that the jury refused to accept this version of the killing.

The finding that Mrs. Marin was killed in the course of her employment clearly points to the fact that the jury drew the following conclusions, all of which find support in the evidence: After drinking tequila and beer, and taking "pills" for about 20 straight hours, Mendoza returned to the junkyard during the early morning hours of Sunday, September 14, 1969, where he continued drinking beer, which he had brought with him. At about 6:00 a. m., while it was still dark (Daylight-Saving Time was in effect), he noticed that the lights had gone on at the service station.

He saw Mrs. Marin, whom he had observed coming to work in the early morning hours on previous occasions, alight from her car and begin walking toward the service station office. He went on the service station premises, grabbed Mrs. Marin from behind and, holding one hand over her mouth, dragged her to the rear of the junkyard where, overcoming her resistance, he forcibly had intercourse with her. Then, fearing that she would report the incident, he strangled her to death with a belt.

In Mendoza's confession, which was introduced into evidence by Commercial, there is no hint of any prior relationship of any kind between Mrs. Marin and her killer.

Section 1 of Article 8309, Tex.Rev.Civ. Stat.Ann., declares that an injury is not "sustained in the course of employment" and is, therefore, not compensable, if it is ". . . caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment." Commercial's "no evidence" and "insufficient evidence" points assailing the jury's "course of employment" findings are based primarily on this statutory exclusion.

Only about eight states have enacted statutes, such as the Texas provision referred to in the preceding paragraph, excluding from the category of compensable injuries those injuries which are intentionally inflicted for personal reasons that are unrelated to the employment of the injured employee. But even in the absence of such legislation, it is almost universally held that when the animosity or dispute which culminates in the assault is imported into the place of employment from the injured employee's private or domestic life, the injury is not compensable, at least where the animosity is not exacerbated by the employment. Small, The Effect of Workmen's Compensation Trends on Agency-Tort Concepts of Scope of Employment, 11 NACCA L.J. 19, 23–62

(1953). That is, the approach of the courts to the intentional injury cases, most of which involve assaults, is the same whether or not the particular jurisdiction has a statute similar to ours.

Apparently, the first Texas case involving an analysis of the intentional injury exclusion is Vivier v. Lumbermen's Indemnity Exchange, 250 S.W. 417 (Tex. Comm'n App.1923), where a night watchman was killed while on duty on his employer's premises. The insurance carrier had succeeded in convincing the Court of Civil Appeals that the injury was not sustained in the course of employment, because the employee's death resulted from an assault by an outsider whose motive was robbery of the employee. The Commission of Appeals rejected this interpretation of the statutory exclusion, holding squarely that the exclusion is applicable only where there existed in the mind of the assailant ". . . antecedent malice . . . causing" the assailant "to follow the employee and inflict injury upon him, wherever he was to be found, or . . . where the employee by his own initiative provoked a difficulty which caused the other party to feel a 'personal' interest in assaulting him." 250 S.W. at 418. In support of its conclusion of compensability, the Commission took pains to ". . . hold that the deceased, in the performance of his duties as night watchman, and in the course of his employment, was placed in a position where his environment contributed to his risk and that the fact that he was killed in the discharge of his duties evidenced the further fact that he would not have been killed *but for* his presence at the plant in the performance of such duties." Id. (Emphasis added.)

Commercial insists that the opinion of the Commission of Appeals in *Vivier* is of no more value as precedent than an opinion of a Court of Civil Appeals in a case where application for writ of error has been refused by the Supreme Court with the notation, perplexing to some, "no reversible error". This belittling of the precedental weight of *Vivier* is based on the fact that the Supreme Court adopted only the *Vivier* judgment, and not the opinion. But, as the Supreme Court pointed out in National Bank of Commerce v. Williams, 125 Tex. 619, 84 S.W.2d 691, 692 (1935), speaking of the authoritative weight of Commission of Appeals decisions in which only the judgment was adopted by the Supreme Court, "These opinions are not binding on the court in the same sense that the approved and adopted opinions are, but they are given great weight by us, and the courts of civil appeals and all lower courts should feel constrained to follow them, until they are overruled by the Supreme Court."

■ The judgment in *Vivier* was adopted and entered as ". . . the judgment of the Supreme Court." 250 S.W. at 420. By contrast, when an application for writ of error is refused, "no reversible error," the judgment of the Court of Civil Appeals does not become the judgment of the Supreme Court. In fact, the notation, "Refused, No Reversible Error," does not even mean that the Supreme Court is satisfied that the Court of Civil Appeals has reached the correct result. It merely means that the application for writ of error presents no error which requires reversal. Rule 483, Texas Rules of Civil Procedure. An erroneous Court of Civil Appeals decision may receive the Supreme Court's "n. r. e." blessing simply because the application for writ of error does not present to the Supreme Court the error which renders the judgment incorrect. Wilson, Hints on Precedent Evaluation, 24 Texas B.J. 1037 (1961). The "n. r. e." notation, then, is as much a commentary by the Supreme Court on the application for writ of error as it is an evaluation of the Court of Civil Appeals judgment. On the other hand, where a judgment of the Commission of Appeals has been adopted as the judgment of the Supreme Court, this necessarily means that the Supreme Court agrees with the result reached by the Commission.

The judgment of the Supreme Court in *Vivier*, then, is necessarily a square holding to the effect that the Court of Civil Appeals erred in holding that the intentional killing, by an outsider, of an employee on duty for the purpose of robbing the employee is not compensable. Stated differently, the unequivocal judgment of the Supreme Court in *Vivier* is that, notwithstanding the language of the intentional injury exclusion, the intentional killing of an on-duty employee, for the purpose of robbing him, is an injury sustained in the course of employment.

The Supreme Court has never overruled, nor has it questioned, *Vivier*. No Court of Civil Appeals has ever questioned the *Vivier* opinion. Following the *Vivier* opinion, interpreting the intentional injury exclusion, the legislature re-enacted, without change, the provision on which Commercial relies, showing that *Vivier* correctly interpreted the statutory provision. See Southern Surety Co. v. Shook, 44 S.W.2d 425 (Tex.Civ.App.—Eastland 1931, writ ref'd). In those cases in which Courts of Civil Appeals have referred to *Vivier,* including some of the cases relied on by Commercial here, they have done so with apparent approval.

We conclude that *Vivier* is the authoritative interpretation of the statutory exclusion.

We consider next the assault cases on which Commercial relies.

In Service Mutual Ins. Co. of Texas v. Vaughn, 130 S.W.2d 392 (Tex.Civ.App.—Beaumont 1939, writ dism'd jdgmt. cor.), Vaughn, a night watchman who was on duty guarding his employer's road machinery, was killed by his son-in-law, Hopkins, who had been lying in wait behind a tree for the purpose of killing his victim. The evidence, as summarized by the Beaumont Court, makes it clear that Hopkins, who had previously threatened to kill Vaughn, felt a personal resentment against Vaughn arising out of marital difficulties between Hopkins and his wife, Vaughn's daughter, and, because of this personal animosity, had sought Vaughn out for the purpose of killing him. *Vaughn*, then, is a case in, which the assailant, prompted by antecedent malice having its roots in the private life of his victim, sought his father-in-law out for the purpose of inflicting retribution. 130 S.W.2d at 394. According to *Vivier,* that is one of the types of cases to which the intentional injury exclusion was meant to apply, and the decision denying compensation in *Vaughn* is in no way inconsistent with *Vivier*.

The *Vaughn* opinion refers to *Vivier* with what can only be construed as approval, since the Beaumont Court pointed out that in *Vivier* there was a causal connection between the employment and the injury. The causal connection which *Vaughn* found in the *Vivier* situation is the fact that in *Vivier* the marauder went on the premises of the employer for the purpose of robbing the employee. It is patent that the assailant's motive in *Vivier*, robbery of the employee, was one unconnected with antecedent malice directed toward the employee personally or arising from the private life of the injured employee or the previous relationship between the assailant and his victim. On the other hand, in *Vaughn*, there was antecedent malice directed toward the employee personally, growing out of the domestic and private life of the parties.

Texas Indemnity Ins. Co. v. Cheely, 232 S.W.2d 124 (Tex.Civ.App.—Amarillo 1950, writ ref'd), is another case in which compensation was denied for injuries resulting from an assault. There, Cheely was assaulted by a fellow employee, Prather. Both men worked as janitors, but they did not work in the same building. A third employee, Chism, promoted the fight by telling Prather that Cheely had made derogatory remarks about Prather. The holding of noncompensability in *Cheely* is based on *Vivier*. After quoting the language from *Vivier* to the effect that the intentional injury exclusion is applicable where antecedent malice in the mind of the

assailant causes him to seek out and injure his victim, the Amarillo Court of Civil Appeals said: "As we view the facts revealed in the instant case, that is exactly what happened between appellee and Prather. On account of the report that had been made to Prather the day before appellee received his injury, Prather became offended and decided to go to appellee and have a settlement with him. This was about a matter that did not in any respect pertain to the employment of either of them. . . . " 232 S.W.2d at 128.

Assuming that the Amarillo Court's interpretation and evaluation of the evidence is correct, *Cheely* is consistent with the *Vivier* rationale and, in view of the language quoted in the preceding paragraph, must be considered as, at the very least, not disapproving of *Vivier*.

In Erwin v. Texas Employers' Ins. Ass'n, 63 S.W.2d 1076, 1077 (Tex.Civ.App.—El Paso 1933, writ ref'd), the employee, who delivered milk for his employer along an established route, returned to his milk wagon after making his last delivery and decided to sit on the curb and drink a bottle of milk. When two men in a car drove up and asked directions, Erwin, the employee, approached the car, opened the door, and asked the men where they wanted to go. When one replied, " 'Four thousand block,' " Erwin went to his milk wagon, obtained an empty milk bottle, and, grasping the bottle by the neck, approached the car again. One of the occupants of the car said, " 'start the motor and let's go.' " As the driver started the motor, one of the occupants of the car shot and killed Erwin. The Court denied compensation, saying that the evidence did not suggest that Erwin was killed because of his employment, and concluded that he was killed because of reasons personal to his assailant.

But the Court pointed out that, at the time he was killed, Erwin was not engaged in any activity designed to further the business interests of his employer, saying:

"While Erwin was on his route in delivering milk and collecting the empty bottles in the line of his duty, we think he may not voluntarily and unnecessarily leave his seat on the curb of the sidewalk, go to the automobile, and open the door and engage in a conversation with the occupants, and, because of some real or fancied surly tone of voice in which he was addressed prior to or at the time he was at the open car door, then go to his milk wagon and take therefrom an empty milk bottle and hold it by the neck in a threatening manner, and, when an injury is inflicted at that very moment, we think it cannot be said the injury resulted from a risk or hazard necessarily or ordinarily or reasonably incident to the conduct of the work or business of delivering milk to the trade and gathering up the empty bottles." 63 S.W.2d at 1078.

Assuming that the Court correctly interpreted the evidence, *Erwin* is not only a case where the employee deliberately turned aside from his duties, but is also a case in which, in the language of *Vivier*, "the employee by his own initiative provoked a difficulty which caused the other party to feel a 'personal' interest in assaulting him." *Erwin* is, therefore, not inconsistent with *Vivier*.

In Wall v. Royal Indemnity Co., 299 S.W. 319 (Tex.Civ.App.—Fort Worth 1927, no writ), the employee was killed on the premises of his employer after he had completed his tour of duty and was on his way home. His place of employment was in an isolated area, and the road leading from his employer's premises to his home was secluded and little traveled, offering an " '. . . excellent place for evildoers to commit crime without being observed . . . . ' " 299 S.W. at 320. While he was leaving the employer's premises on the way home, he was shot to death by two men who, aware of the secluded nature of the area and the " '. . . ease with which an ambuscade could be arranged on the road' " went to meet the

employee at a "'point on said road which would be hidden from the view of outside persons, and free from outside interference, for the purpose of killing and murdering . . .'" his particular employee. *Id.* The Court held that a general demurrer to plaintiff's petition, which alleged facts as summarized above, was properly sustained.

This holding was based on ". . . the absence of any showing that the crime would not have been committed at any other place, or but for such employment." 299 S.W. at 321.

The *Wall* opinion, which makes no mention of *Vivier*, cites only three cases in support of its holding. Two of these cases, London Guaranty & Accident Co. v. Smith, 290 S.W. 774 (Tex.Civ.App.— Waco 1927, writ ref'd), and American Indemnity Co. v. Dinkins, 211 S.W. 949 (Tex.Civ.App.—Beaumont 1919, writ ref'd), are "going and coming" cases applying the general rule that an injury sustained while the employee is on his way home from work is not an injury sustained in the course of his employment. The third case relied on in *Wall*, Ocean Accident & Guarantee Corp. v. Riggins, 291 S.W. 276 (Tex. Civ.App.—Waco 1927, writ ref'd), is a case in which the employee had left his employer's premises and had gone elsewhere to attend to strictly personal business having nothing to do with the business affairs of his employer.

In addition, the allegations of the petition in *Wall* disclose that the assassins sought out the employee, Wall, for the purpose of killing him. It is one thing for the assailant to say, "I am going to the X Company, where Wall works, for the purpose of killing Wall," and another thing for him to say, "I am going to the X Company for the purpose of killing whoever might be on duty there." The first case is an example of antecedent malice, directed toward the victim personally, and, there-

fore, not compensable under *Vivier*. If we apply the *Vivier* rationale, plaintiff in *Wall* brought himself squarely within the intentional injury exclusion.

None of the assault cases relied on by Commercial question *Vivier*; none is inconsistent with *Vivier*; the holding in one is expressly based on *Vivier*; and in another, *Vivier* is cited with what is at least apparent approval. There is nothing in these four cases which tends to indicate that we should not "feel constrained" to follow *Vivier*.

*Vivier* was expressly approved and followed in Southern Surety Co. v. Shook, supra, awarding compensation in a case where the killer murdered the employee at his place of employment for the purpose of robbing the employee and watching him "kick." It should be pointed out that in *Vaughn*, discussed above, the Beaumont Court of Civil Appeals pointed out that in *Shook*, as in *Vivier*, the fact that the assailant went on the employer's premises for the purpose of robbing the employee, furnished the necessary causal connection between the employment and the injury. The *Vaughn* opinion, then, expresses approval of *Shook*.

*Vivier* was cited with approval in Travelers Ins. Co. v. Williams, 378 S.W.2d 110, 113 (Tex.Civ.App.—Amarillo 1964, writ ref'd n. r. e.), and Aetna Ins. Co. v. Hart, 315 S.W.2d 169, 174 (Tex.Civ.App.— Houston 1958, writ ref'd n. r. e.). While neither case involves an intentional injury, *Vivier* is cited in support of the statement that the fact that the employee might have suffered the same injury while not in the course of employment, does not prevent the injury from being compensable.

Travelers Ins. Co. v. Hampton, 414 S.W. 2d 712 (Tex.Civ.App.—Eastland 1967, writ ref'd n. r. e.), and Petroleum Casualty Co. v. Kincaid, 93 S.W.2d 499 (Tex.Civ.App.— Eastland 1936, writ dism'd),[1] are cases in

---

1. The Supreme Court originally granted the application for writ of error in *Kin-* caid. However, the application was subsequently dismissed on procedural

which compensation was awarded where the employee was mortally assaulted by an "insane" assailant. In neither case does the opinion disclose whether the killer's mental disturbance was sufficient to relieve him from criminal liability under the traditional criminal law rule, which relieves an actor of criminal responsibility only if the mental imbalance is such as to deprive him of the ability to distinguish between "right and wrong." In both cases, the award of compensation appears to be based on the fact that the demented killer was incapable of forming a rational culpable intent; and that, therefore, the injury was not an intentional injury within the meaning of the statutory exclusion on which Commercial here relies.

Even if it be assumed that the mental incapacity of the assassin prevents an injury from being classified as intentional,[2] the award of compensation in *Hampton* necessarily means that the injury was sustained in the course of employment and arose out of, or originated in, the employment, since such findings are essential to the recovery of compensation in any case. The Court pointed out that the murdered employee's ". . . only contact with the killer was caused directly and solely by his employment, which required him to work with" the lunatic's intended victim "and, thus, placed him in the danger zone where only an employee of Pinkie's had to be." 414 S.W.2d at 715. At the time that the employee was killed, he was engaged in locking the back door, which it was his duty to lock when he left at the close of business, and had in his hand a daily report which it was his duty to mail to his employer. These facts, said the Court, were ". . . sufficient to support the finding that" the employee "was in the course of his employment . . ." at the time he was killed coming out of the back door, which it was his duty to lock. *Id.*

The argument, that the fact that the assault was a sexual assault precludes per se the finding that there was a causal connection between the employment and the injury, is based on the fallacy that the subject matter of, or the motive for, the assault is the only possible way of connecting the attack with the employment. The rationale of *Vaughn* undermines this argument. There, the Court, after quoting from a case denying compensation for injuries resulting from an intentional assault, engendered by the fact that the victim was the husband of the assailant's paramour, said, "On the authority of that case, it is our conclusion that there must be a direct causal connection between the employment and the injury, such as robbery, arson, or some other motive inducing the marauder to enter upon the employer's premises." 130 S.W.2d at 394. As pointed out before, the *Vaughn* opinion finds that the assailant's purpose to rob the employee in *Vivier* and *Shook* furnished the necessary causal connection in those cases. To say that the required causal connection is present when

---

grounds. Petroleum Casualty Co. v. Kincaid, 132 Tex. 325, 122 S.W.2d 1048 (1939).

2. The proposition is of doubtful validity, at best. See Eidinoff v. Andress, 321 S.W.2d 368, 371 (Tex.Civ.App.—El Paso 1959, writ ref'd n. r. e.); Prosser, Law of Torts (3d ed. 1964) Section 129, pp. 1028–30; Note, 77 A.L.R.2d 625 (1961). The fact that a person is "insane" does not mean that he is incapable of acting with "intent," that is, with a purpose of bringing about the particular harmful result. Even in criminal cases, where the fact of insanity sometimes warrants the conclusion that defendant did not commit the *actus reus* with the accompanying mental state required for conviction of the crime charged, the insanity defense is broader than the *mens rea* concept. Note, 112 Univ. of Pa.L.Rev. 733, 734 (1964). Stated differently, the defense of insanity is not based on the notion that the defendant is incapable of forming the intent to commit the prohibited act. Model Penal Code (Tent.Draft No. 4, 1955) Section 4.01, Comment. This is evidenced by the fact that the insanity defense would be available even in prosecutions for "strict liability" offenses which require no proof of the defendant's mental state. See Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 55, 78 (1933), where the author argues that the defense should not be available in such cases.

the assassin goes upon the premises of the employer for the purpose of robbing the employee, but that there is no such causal connection when he goes on the employer's premises for the purpose of raping the employee, is to draw a distinction which is so subtle that it defies understanding.

■ It is well settled that if an injury is received by an employee while he is acting within the course of his employment, and such injury is the result of a risk or hazard of the employment, it is compensable. American General Ins. Co. v. Williams, 149 Tex. 1, 227 S.W.2d 788 (1950); Lumberman's Reciprocal Ass'n. v. Behnken, 112 Tex. 103, 246 S.W. 72, 73 (1922). With specific reference to assaults this well settled doctrine, at the very least, means as *Vivier* and *Shook* clearly point out, that an assault arises out of the employment if the risk of assault is increased because of the nature of the work, or if the reason for the assault is a quarrel having its origin in the work.

It is contended that to hold that an assault is compensable if the risk of assault is increased because of the nature of the work is to adopt the "positional risk" test, sometimes referred to as the "environmental risk" or "but-for" test, and that this test has been rejected by the Texas courts. We know of no Texas case rejecting this test. It is the test which was applied in *Vivier* and *Shook*; and in *Hampton*, it was clearly the test applied in determining whether the killing arose from, and originated in, the work. The correspondence between this test and the "street risk" doctrine is obvious. Although risks of the street are dangers which an employee shares in common with the general public, if the performance of his duties make it necessary for the employee to be on the streets, the risks he there encounters are held to be incident to his employment. Jecker v. Western Alliance Ins. Co., 369 S.W.2d 776 (Tex.1963). An excellent example of the application of this doctrine is found in the opinion of this Court in Standard Fire Ins. Co. v. Cuellar, 468 S.W.2d 880 (Tex.Civ.App.1971, writ

ref'd n. r. e.), where compensation was awarded to a truck driver who, while driving down a highway in his truck after making a delivery of furniture, was stung by an insect. In reaching this conclusion, Justice Klingeman rejected the argument that the insect sting or bite " . . . did not have its origin in any causative danger prevailing in the conditions of appellee's employment, and that he was not exposed . . . apart from his employment", and that the "accident . . . resulted from a danger to which mankind in general was equally exposed." 468 S.W.2d at 882. In concluding that the injury had to do with, and originated in, the claimant's employment, Justice Klingeman said, "The evidence establishes that the insect bite sustained by Cuellar resulted from the effort on his part to discharge in an orderly way the duties of his employment. He was stung while in the performance of his duties of employment, and he was subjected to this risk by carrying out his designated duties. We think it clear that the insect sting was a risk or hazard of his employment and is compensable." 468 S.W.2d at 883.

As Commercial points out, *Cuellar* is not an assault or intentional injury case. However, the basis for our conclusion that the insect sting was a compensable injury is, like the street risk and travel risk cases, clearly based on the "positional risk" or "but-for" doctrine. It should be noted that the *Cuellar* opinion, by way of footnote, refers, not disapprovingly, to *Vivier* and *Shook*. 468 S.W.2d at 883, ftnt. 1.

The condition of Mrs. Marin's employment did not merely provide the time and place for the assault upon her. The conditions of her employment increased the risk of such attack, and subjected her to a danger incidental to such employment. While it may be a sad and tragic commentary upon our times, common knowledge of the current rate of crime to which our society is being subjected compels the conclusion that one whose employment requires that he earn his livelihood during the hours of

darkness is subject to occupational hazards not shared by others.

It is true that in *Vaughn* the Beaumont Court considered the "positional risk" theory at some length and refused to apply it under the circumstances of the case before the Court. However, to insist that the Court in *Vaughn* rejected the doctrine is to charge that the Court did not understand the doctrine. The positional-risk theory would not require a finding of compensable injury under the *Vaughn* facts. Under that test, assaults are compensable only if they are not motivated by personal vengeance stemming from contact with the employee outside of his employment. Crotty v. Driver Harris Co., 49 N.J.Super. 60, 139 A.2d 126 (1958). The precise nature of the *Vaughn* holding is made clear by the Beaumont Court's reliance on the following language from January-Wood Co. v. Schumacher, 231 Ky. 705, 22 S.W.2d 117, 120 (1929):

> "In the instant case the personal animosity of Eddings was the direct cause of the employee's death. He did not kill Schumacher because he was the company's night watchman on duty, but because he was the husband of his paramour. Does the fact that his duty put him in such a place as gave his murderer an opportunity to carry out his nefarious design with less probability of apprehension than if he did so elsewhere constitute such causal relation as to bring the result within the term 'arising out of his employment'? We hardly think so, on both reason and authority."

As already pointed out, Vaughn was not killed because he was the night watchman on duty, but because he was the father of the assassin's wife. The positional-risk theory is, therefore, not applicable to the facts before the Court in *Vaughn*, and the *Vaughn* decision is correct under *Vivier*.

If *Vaughn* is put forward as a rejection of the positional-risk theory, it must be concluded that the Court was laboring under a misapprehension as to the nature of such theory. If the Court intended to reject the theory, it went wrong at the beginning when it distorted the test by making the comparison with a selected group instead of with the general public. This is shown by the following portion of the *Vaughn* opinion: *"Vaughn assumed no greater hazard, by reason of his employment, than other night watchmen engaged in the same character of work."* 130 S.W.2d at 394. (Emphasis added.)

Commercial relies heavily on State ex rel. Common School District v. District Court, 140 Minn. 470, 168 N.W. 555 (1918), where a young female school teacher, when her work at the school was done, started for her home, taking a short cut through the woods, taking with her some student papers which she intended to correct at home. After she had left the school grounds, she was raped by a man who, in the language of the opinion, was bent on ". . . the gratification of his passions. . . ." The Minnesota Court, without stopping to consider if the injury to the teacher, since she was on her way home from work, occurred in the course of her employment, held that the injury did not arise out of the employment within the meaning of a statutory provision identical in wording to the Texas intentional injury exclusion. While it can be pointed out that this case is patently a "going and coming case," and that the case was correctly decided on the additional ground that, at the time of the decision, the Minnesota statute did not cover workmen except while they were on or about the premises where their work was done or their employment required their presence, Minn.Gen.Stat., 1913, Secs. 8195 et seq., and that, therefore, the case is correctly decided without reference to the intentional injury exclusion, it is apparent from the Court's opinion that the conclusion of noncompensability is based on the intentional injury exclusion. If this is true, the opinion is inconsistent with the *Vivier* rationale, and we know of no reason why a Minnesota decision should be more binding on us than that of a Texas court.

In Employers Ins. Co. of Alabama v. Wright, 108 Ga.App. 380, 133 S.E.2d 39 (1963), compensation was awarded where a female employee of a laundry pick-up station was raped, as in the case before us, on her employer's premises, by a man who pretended to be a customer. Commercial attempts to distinguish this case by saying that the Georgia statute provided that an injury ". . . arises 'in the course of employment,' within the meaning of the Workmen's Compensation Act, when it occurs within the period of the employment, at a place where the employee reasonably may be in the performance of his duties, and while he is fulfilling those duties or engaged in doing something incidental thereto." There is no such statutory provision in Georgia. The applicable Georgia statutory provision excludes from the category of compensable injuries any injury ". . . caused by the wilful act of a third person directed against an employee for reasons personal to such employee." Ga. Code Ann., Sec. 114–102. The language which Commercial presents as a Georgia statutory provision is taken from the *Wright* opinion, and is merely a statement of the manner in which the Georgia intentional injury exclusion, which is not significantly different from our statute, has been interpreted by the Georgia courts.

We conclude that the "course of employment" finding is supported by evidence and is not contrary to the overwhelming weight and preponderance of the evidence.

The points of error presented by the other appellants, Mr. and Mrs. Casares, the surviving parents of the murdered employee, complain of the trial court's refusal to submit three requested special issues and its failure to impose a constructive trust in their favor on the death benefits, which the judgment ordered Commercial to pay.

The first requested special issue inquired whether appellee and Mrs. Marin were married at the time Mrs. Marin was killed. This fact is undisputed and, therefore, it was not error for the court to refuse to submit this issue.

The second special issue inquired whether ". . . the employment of . . . Santa Emily Marin . . . was proximately caused by the refusal of" her husband, appellee, "to support her." The third requested issue asked whether Mrs. Marin ". . . would not have been working in the employment in question but for the refusal" of appellee "to support her."

These two issues were not relevant to the case. Even if we assume that appellee's refusal to support his wife was the cause, actual and legal, of her accepting the employment as a service station attendant, the existence of these facts would not affect appellee's rights to receive compensation for her death.

Article 8306, Section 8a, Tex.Rev.Civ. Stat.Ann., requires that the death benefits be paid to the surviving husband, except where he has abandoned the deceased employee for a period of three years. The statutory exception is inapplicable here, since, at the time of the killing, appellee had not abandoned his wife for three years.

In all cases where a constructive trust is imposed, the result is to restore to the "beneficiary" property of which he has been unjustly deprived and to take from the "trustee" property the retention of which by him would result in his corresponding unjust enrichment. That is, the result is to restore the parties to the position they occupied before the "trustee" acquired the property. To require appellee here to pay over the compensation award to his parents-in-law would not restore the latter to the position they occupied before appellee obtained the money. See, generally, Restatement, Restitution (1937), Section 160, Comment d.

The facts of this case do not bring it within any of the situations where the courts have imposed constructive trusts on property. See 5 Scott, Trusts (3d ed. 1967) Chapter 13. Perhaps the most analogous

constructive trust situation is that in which a person has, through murder, acquired title to property. It certainly cannot be said that, under the facts of this case, appellee caused the death of his wife. He did not intentionally kill her and, as a result of such intentional homicide, obtain title to property. Even if we indulge the rash presumption that he accidentally or negligently caused her death, it is settled that where one kills another accidentally or negligently, the rule preventing a killer from acquiring property as the result of the death is inapplicable. 5 Scott, op. cit., Section 492.3, p. 3504.

We see no reason for not following the legislative command that where a married woman is killed in the course of her employment, compensation is payable to the surviving husband.

The judgment of the trial court is affirmed.