**TRADERS AND GENERAL
INSURANCE COMPANY,**
Appellant,

v.

**Jerry Gene ALLEN, Appellee.**

**No. 09–84–352 CV.**

Court of Appeals of Texas,
Beaumont.

February 27, 1986.

Clayton E. Dark, Jr., Lufkin, for appellant.

Stephen M. Rienstra, Beaumont, for appellee.

## OPINION

DIES, Chief Justice.

This is a worker's compensation case tried to a jury, where Jerry Gene Allen, plaintiff below, recovered partial and temporary disability which, when translated into a judgment against defendant below, Traders and General Insurance Company, the latter appeals to this Court.

Defendant has five points of error. The first three involve the question of whether plaintiff's injury arose in his scope of employment with Pluss-Tex of Lufkin, Texas. The facts of this case are quite incredible. Pluss-Tex is a chicken processing plant and has a chain link fence around it. One of the streets of Lufkin it faces is Weber Street. Two city policemen were investigating an 18-wheel chicken truck for a traffic violation. Its purpose, no doubt, either was to deliver live chickens or receive processed chickens from Pluss-Tex, since it was parked on Weber Street. The plaintiff was admittedly on duty with Pluss-Tex at the time, and was behind the fence. He was actually checking or fixing lung and entrail pumps used in processing the chickens for market.

For some reason (disputed by the testimony of the plaintiff and the one policeman who testified), the two policemen became enraged at the plaintiff. They drove their squad car through the gate of the fence around Pluss-Tex and up to plaintiff. They neither had an invitation to do this nor probable cause. The police did not know the plaintiff, and he did not know them. Neither were they looking for him. There was no warrant for his arrest.

The officers got out of the squad car; one of them carried a flashlight although it was daylight; both were armed with .357 Magnum handguns. One of the officers (the one who did not testify) then beat the plaintiff to the ground with the flashlight. Then the officers fired their weapons at least six times at the plaintiff who was unarmed. Four of the bullets entered plaintiff's body—in both legs, the right forearm, and chest. Plaintiff was taken to the hospital where surgery was performed. Other surgery has since been performed, and the record reveals still more surgery is probable.

*TEX.REV.CIV.STAT.ANN. art. 8309, sec. 1* (Vernon 1967), provides in part:

"The term 'injury sustained in the course of employment,' as used in this Act, shall not include:

" . . .

"(2) An injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment."

The cases are legion that the Worker's Compensation Act must be liberally construed. *See TEX.REV.CIV. STAT.ANN. art. 8309, sec. 1*, note 3 (Vernon Supp.1986). An employee does not cease to be in the course of his employment because he is not actually engaged in doing what is especially prescribed to and for him if an emergency arises and, thereafter, the employee does what seems necessary and understandable. *See Texas Employers' Insurance Association v. Thomas*, 415 S.W.2d 18 (Tex.Civ.App.—Fort Worth 1967, no writ). If an employee is acting within the course of his employment and the injury is the result of a risk or hazard of the employment, it is compensable. *Commercial Standard Insurance Company v. Marin*, 488 S.W.2d 861 (Tex.Civ.App.—San Antonio 1972, writ ref'd n.r.e.).

The facts in the *Marin* case are certainly no more bizarre than the case we review. There, a service station employee was raped and murdered in the darkness of the early morning hours as she was in the process of opening her employer's station for business. In an exhaustive and eloquent decision the court held the employee's death was the result of an injury sustained in the course of employment. Certainly, the employee's rape and murder did

not arise out of any facet of her employment.

Often the employee is presumed to be in the course of employment. *International Ins. Co. v. Deatherage*, 628 S.W.2d 209 (Tex.App.—Austin 1982, no writ).

■ If one accepts completely the officer's incredible testimony in this case, one cannot understand why the police car ran through a chain link fence surrounding the Pluss-Tex plant—without probable cause—and then shot an unarmed employee four times. The employee was not wanted by the police and was on duty with Pluss-Tex when he was shot. Apparently the only "reasons personal to" the officer for beating and shooting the claimant arose out of the officer's objections to the truck parked on Weber Street and the possible retort of claimant. This would be an incident arising out of the employment or, though fortunately remote, a hazard of the job.

At any rate, to escape liability, it was the carrier's burden to place itself under the section of the statute quoted in this opinion. This it did not do. There is no evidence to support this defense. This point of error is overruled.

Defendant has two other points of error which we find without merit and they are overruled.

The judgment of the trial court is affirmed.

Affirmed.

BROOKSHIRE, Justice, dissenting.

This dissent is respectfully filed. Workers' compensation case tried before a jury. Jerry Gene Allen was employed as a maintenance mechanic for the Pluss-Tex Poultry Company in Lufkin on June 8, 1982. Customarily, Allen worked the "night shift". He usually started work at about 10:00 p.m. and finished his shift at around 6:30 to 8:00 a.m. the following morning. He usually worked inside the plant of Pluss-Tex which was surrounded by a chain link fence. Early on the morning of June 8, 1982, two Lufkin police officers, Curtis Herrick and Gary Spencer, stopped a poultry truck on Weber Street. Weber Street was located adjacent to Allen's employer's premises.

Apparently, a traffic violation citation was issued to the driver of the poultry truck. The poultry truck that had been stopped was characterized as a "chicken truck". It was an 18 wheeler loaded down with big steel chicken crates. It was the type of truck that normally makes deliveries and pickups "there at Pluss-Tex". The guard had opened the gate into the plant at Weber Street.

Then the officers started to leave the area. As the police car commenced to leave the area, Officer Gary Spencer testified that he saw Allen throw an object of some kind at the patrol car. Spencer also said that he could see that Allen was shouting at the officers although he could not hear the words. Allen denied throwing any objects or making any movements toward the police car. Allen also denied shouting at Herrick and Spencer. Then a dramatic event took place. The officers—or at least the driver of the patrol car—turned into the premises of Pluss-Tex, driving through a gate in the chain link fence and stopping the police vehicle either very near or in front of Allen. The officers immediately got out of their vehicle.

The evidence is conflicting but shortly thereafter—after the officers were out of the car—apparently Allen turned away and ran. The officers pursued Allen through various buildings and areas of the plant. The officers caught up with Allen. The evidence is not disputed to the effect that Allen was shot several times with a service revolver belonging to one of the police officers. The worker received "through and through" gunshot wounds to his left thigh and his right thigh with no bone fractures. Allen also sustained a gunshot wound to the upper abdomen. A bullet fragment from that wound lodged in his chest wall. Even though the bullet fragment lodged in his chest wall, there were no bone fractures. Allen received a gunshot wound to his right forearm which shattered a bone.

In the trial court, the parties agreed that the Appellee had received an injury but the carrier put in issue the fact that the injury was an accidental injury. The carrier also denied that the injury was received in the course and scope of the Appellee's employment. The carrier pleaded that the injuries to the Appellee, Allen, were sustained as a result of the acts of third persons for reasons personal to him.

### ALLEN'S TESTIMONY

The Appellee specialized as a welder and maintenance mechanic. He worked on the refrigeration facilities and on the chicken-picking machines. It was highly important to keep all the machinery running constantly because Pluss-Tex, at times, ran on a 24-hour a day basis. On the day of the occurrence, he was making a routine check and started to go into a "blast tunnel". He was near the end of his working day. Near the blast tunnel, there were "lung pumps and gut pumps". These pumps sucked the lungs and guts out of the chickens inside the processing plant and had to be working right. Allen was in the company of two other employees, "Andrew" and "Clayton Davis". According to Allen's version, he was drinking a coke and talking to a co-employee, Clayton, when he looked up and saw a patrol car of the Lufkin Police Department rushing through the open gate at a high speed. As Allen and Clayton headed toward their next duties, they heard a loud noise. It was a car coming. Allen said:

> "A . . . It was a car getting on it, and I heard rocks and everything flying up and looked up and this patrol car was rushing in through the open gate . . .
>
> . . . .
>
> "A . . . and I looked down. It was about a foot from my knee, and that's when I, you know, the patrol car came in there."

In short, Allen then testified that the next thing he knew was that the two police officers were jumping out of the car and running around the doors to get out and calling him (Allen) "a sorry m_____ f_____" and started telling me to get my ass over towards them but Allen decided to run off from them. Allen was trying to get to the personnel office.

According to Allen, one of the policemen had a large flashlight in his hand although it was daytime. Allen said that no one shouted "Stop. Police." Allen said it wasn't a normal situation or normal routine. He did not recognize either of the police officers. To his knowledge, he had never seen either of them before. He had not had any problems with the Lufkin Police Department or any member of it. Allen was attempting to run away from the officers, trying to get through the cafeteria and heading out a door to the personnel office. Still, up to this point, Allen had no idea why the police officers were after him.

As Allen was running, he had with him a pair of channel locks that fell out of his tool pouch. One of the officers picked them up and threw them and hit Allen in the back of his shoulder. After the channel locks hit his shoulder, Allen stopped and turned around. He looked at the officers. Allen said the officers were making motions, wanting and inviting Allen to hit one of the officers, repeating again: "Hit me, you sorry m_____ f_____." Allen said he replied: "No, sir." He was not told he was under arrest. Allen then said one of the officers said: "Hit him. Hit him. Hit him again." At that time, Allen started receiving blows on his head made with a large object that he described as "something heavy". This, of course, is Allen's testimony and his version of the events. According to Allen, he then went to his knees and lost consciousness.

Later on, he returned to a semi-conscious daze. Then, Allen said he was planning to use his screwdriver to jab the officer who was nearest to him. Allen said he dropped the screwdriver. He said he could make out a blurred vision, something that looked like a hand gun. Allen said he automatically got up from his knees to defend himself. The firearm went off two times in the ground between the feet of Allen and one officer. Then, Allen started running again or trying to run. Allen was still in a dazed

state and he said "Well, they started shooting at me, and uh, I started hearing those shots." He said he thought he ran a good ways, but it was only a few steps. As he was running away from the officers, he realized, first, that he had been beaten on the head and that he had been hit. Allen said:

"A ... I couldn't take no more, and I was trying to get away and save my life. And I started hearing all these shots, and my leg was just ripped open. It just—uh, unless you've been shot, I can't tell you how—

. . . .

A It exploded on me. . . . "

He felt two bullets. The next one he felt was in his chest. "My chest just exploded open, just ripped up, and this ungodly pain just—" Allen said there were several more shots. Allen finally said: "I had enough. Don't shoot me no more." Allen said the officer shot yet again while he was on the ground. I concede that the above is a brief summary of Allen's testimony.

From Allen's version of the facts, I simply do not think nor do I perceive that the shooting and hitting arose in the course and scope of his employment for the Pluss-Tex Poultry Company, nor were they in the furtherance of the business of his employer nor did they arise out of his employment. *The police took no hostile actions against either of his co-employees, standing close to Appellee.*

### SPENCER'S TESTIMONY

Officer Spencer swore that he did not know that Allen was an employee of Pluss-Tex. He did not know Appellee's name. He testified that he approached Allen for strictly personal reasons and for reasons directed to Allen as an individual person as distinguished from being an employee of any employer.

In capsule form, Allen testified that his attention was directed toward the police car while he was drinking a coke near the fence. Allen then said the next thing he knew was that he heard a loud noise and the patrol car coming through the gate.

Allen heard rocks flying up as the patrol car was rushing through the open gates. Allen swore he did not know what the police were doing and did not know of any reason why the police wanted to talk to him. Certainly Allen does not put himself in the course and scope of his employment in relationship to the brutal assault and battery he later sustained. But Allen did testify that he ran from the police and the police pursued him personally and the patrolmen shot him four times. It is important and crucial to stress that the evidence clearly demonstrates that there were two other employees with Allen, standing beside him. Allen said that it was obvious that the police officers were directing their attention and their actions against Allen and not against either one of his co-employees. Allen also said he did not believe that the police had become confused and misidentified him with any other employee.

Officer Spencer testified that he observed one of the individuals—who later turned out to be Allen—to be a white male. It appeared that this individual was looking at the patrol car and yelling. Then the officer observed the three of them "merely standing—they were standing three abreast and appeared to be doing no work that I could tell." The officer estimated that he was about ten or fifteen yards from the employees. The officer did observe the facial expressions of one of the three. He identified the person that was yelling to be Appellee, Jerry Allen. Later, he learned that this individual was Jerry Allen. He observed that Allen wore his hair long and had a beard and that his appearance was the same as a white male, being the Appellee, at the time of the trial. It appeared to Spencer that this same individual, Jerry Allen, was still yelling something as the patrol car drove by. Very shortly thereafter, Spencer said that Allen "appeared to throw something from his right hand at the patrol car as we drove past". Spencer could not identify the object thrown. It did appear that the object could have been a rock. Later, Spencer testified more definitely that, while coming up to Frank

Street he did observe Allen throw an object. At that point, Spencer informed Herrick of this fact of a thrown object and Officer Herrick made a statement, something to the effect: "Well, why don't we go back and talk to him?"

Then, at that point, the officers backed the patrol vehicle up Weber Street. The gate was open. The patrol car pulled into the gate and into the premises of Pluss-Tex. Spencer said they went into the gate in a reasonable manner; that they did not burn rubber, the tires did not squeal, and that they were not in a hurry. Herrick stopped the vehicle. Officer Herrick was carrying a flashlight. Spencer did not have a flashlight or a nightstick with him. Spencer did have his handgun and handcuffs. Allen was standing in the middle of the roadway. The two other employees stepped off to the side.

Allen did not step to the side. He was standing approximately one foot in front of the vehicle when the vehicle stopped. Spencer and Herrick exited the vehicle. Spencer said the officers were not in a hurry. Spencer said that no statements were made to Allen either by Herrick or Spencer. The only statement made at that time was made by Allen. Spencer said his only intention was to go to see Allen and merely question him about the incident that he had observed. Spencer then swore, in response to what statement was made: "Uh, he made a cursive—used cursive language ... it was some sort of a statement involving MF word." Spencer said Allen said: "You MF." Spencer said Herrick made no response. Allen positioned himself to run and did run.

At this point, Spencer said there was no opportunity to have a conversation with Allen. Spencer ran after Allen. Allen ran through a building (probably the cafeteria). He ran through some doors. Allen had a tool pouch. Shortly thereafter, Allen dropped from his tool box a pair of channel lock type pliers. Spencer was the only police officer that testified. Herrick was not presented as a witness. While Spencer was chasing Allen, Spencer picked up the pliers. He threw the channel locks at Allen and hit him. Allen was struck by the pliers in the middle of his back, Allen slowing his pace. The two actually came face to face. Allen was yelling something and Spencer was yelling back at Allen. Officer Herrick tried to restrain Allen from running off a second time. Spencer grabbed Allen by his right arm. There was a struggle. Allen tried to pull lose. Allen was resisting. Spencer said that Allen was the stronger of the two. Then they tried to handcuff Allen but both officers were not able to get Allen's hands fully behind him. Then Allen apparently struggled with more success and Spencer told Officer Herrick: "He's not going to stop resisting. If you have to, use your flashlight to restrain him." That is the point at which the flashlight struck Allen on the head. Then Allen appeared to cease the struggle. He bent down; he bent over toward the ground. Officer Herrick had hit Allen hard enough to make Allen lose his balance. At about that time, Spencer observed Allen's hand. Allen had his hand on the grip of Spencer's pistol. Spencer said: "... [A]ll I could think of was to regain control or not to let him gain control of my weapon. I placed my right hand on his right hand, which was on the grip of my service revolver." Spencer said that Allen pulled the gun out; he pulled the gun clear out of the holster and that Allen had full control of the weapon. Spencer thought that Allen had his finger on the trigger and the gun was cocked. Spencer testified, at that point, that he heard one shot fired from his own weapon. Spencer could not see where the shot was directed. The struggle continued. Spencer heard a second shot from the same weapon. Spencer testified he was very nervous and excited at that time. Allen continued to resist. Spencer shouted a warning to Officer Herrick about the weapon. Spencer felt he was losing control of the situation and also losing control of Allen. Spencer pushed Allen away from him but Allen still had the weapon. Spencer did claim that a hole in one of his trouser legs was a bullet hole. Allen had a different explanation. At that time, Spencer heard the first shot

that Officer Herrick fired. Immediately, several more shots were fired.

## CARRIER'S CONTENTIONS

The carrier denied that the injury was an accidental one and stressed that the injuries to the Appellee, Allen, were sustained as a result of an act of a third person, intended to injure Appellee, because of reasons personal to Appellee and not directed against him as an employee or because of his employment.

The most crucial and conspicious points of error are those set out first in Appellant's brief. Appellant contends that there is "no evidence" to support a jury finding that the actions of the patrolmen were directed against Appellee as an employee or because of his employment rather than for reasons personal to Appellee.

A second point of error says that the evidence presented on such a finding is "factually insufficient to support such finding," followed by a contention that the jury's answers and the actions of the officers directed against Allen as an employee or because of his employment, rather than for reasons personal to Appellee, were against the great weight and preponderance of the evidence.

I have reviewed the entire record under the appropriate standards of appellate review. I find there is no evidence to support the jury's finding that the Appellee's injury was caused by certain actions of the Lufkin Police Department alleged to have been directed against Allen as an employee or because of his employment. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); Robert W. Calvert " 'No Evidence' and 'Insufficient Evidence' Points of Error", *38 Texas L.Rev. 361* (1960); Garwood "The Question of Insufficient Evidence on Appeal", *30 Texas L.Rev. 803* (1952). As a corollary holding, I, of course, find that the evidence was insufficient to support such a jury's finding and that *that* finding was also against the overwhelming weight and preponderance of the evidence.

*TEX.REV.CIV.STAT.ANN. art. 8309, sec. 1* (Vernon 1967).

As I construe Appellant's brief, I find, additionally, there is no evidence of probative force that Appellee's injuries—admittedly severe and disabling—arose out of his employment or arose because of his employment. I decide that Allen simply did not show, by any evidence of probative force, that his injury was of such a kind or character that it had to do with and originated in the employer's work, trade, business or profession, or in the furtherance of the employer's business. *TEX.REV.CIV. STAT.ANN. art. 8306, sec. 1* (Vernon 1967); *Deatherage v. International Ins. Co.*, 615 S.W.2d 181.(Tex.1981). In *Deatherage*, the court wrote, at pages 181–182:

"It is essential that an injury be sustained in the course of employment so as to entitle the employee or his statutory beneficiaries to recover workers' compensation benefits. Article 8306, sec. 1. As a general rule, a claimant must meet two requirements: (1) the injury must have occurred while the employee was engaged in or about the furtherance of the employer's affairs or business; and (2) the claimant must show that the injury was of a kind and character that had to do with and originated in the employer's work, trade, business or profession. Article 8309, sec. 1 (4); *Biggs v. United States Fire Insurance Co.*, 611 S.W.2d 624 (Tex.1981); *Texas Employers Ins. Ass'n v. Page*, 553 S.W.2d 98 (Tex.1977); *Shelton v. Standard Insurance Co.*, 389 S.W.2d 290 ·(Tex.1965); *Texas General Indemnity Co. v. Bottom*, 365 S.W.2d 350 (Tex. 1963)."

*See Vivier v. Lumbermen's Indemnity Exch.*, 250 S.W. 417 (Tex.Comm'n App. 1923, judgmt. adopted).

For an excellent opinion, concerning workers' compensation claims arising out of attack, *see Commercial Standard Insurance Company v. Marin*, 488 S.W.2d 861 (Tex.Civ.App.—San Antonio 1972, writ ref'd n.r.e.) I would distinguish our case from *Marin, supra,* because, although I agree there was no prior or antecedent

malice, having its roots in the private life of the assaulted person; nevertheless, I think that this assault did not arise out of Appellee's employment and that the risk of this assault was not increased because of the nature or location of his work for Pluss-Tex Poultry. Hence, I would distinguish the case subjudice from *Marin, supra.* As I review the record, from the Appellee's own testimony, the nature of his work, his duties, and obligations to Pluss-Tex Poultry did not make this encounter or assault "incident to his employment". *See Marin, supra,* at page 869.

The writer believes that Allen gave no testimony that would show that his injuries "had to do with and originated in the employer's work". He really gave no explanation at all. The police officer's testimony shows that the confrontation that lead to the injury was caused by Allen's yelling and throwing some object towards, or at, the police car. This record is devoid of any probative evidence to show that Allen's yelling or throwing the small object at the police car had anything to do with or, in any way, originated or arose out of the employer's trade or business.

I would reverse and render that Appellee, Allen, take nothing against the carrier.